Raymond J. DONOVAN, Secretary of Labor, et al., Plaintiffs,

v.

UNITED STATES POSTAL SERVICE, Defendant.

Regis T. ATWOOD, et al., Plaintiffs,

v.

UNITED STATES POSTAL SERVICE, Defendant.

Civ. A. Nos. 78–0602, 79–1808.

United States District Court, District of Columbia.

May 22, 1981.

Sue Ann Wolff, Douglas N. White, Peter B. Dolan, Counsel for Trial Litigation, U. S. Dept. of Labor, Bruce H. Simon, Jani K. Rachelson, Mozart G. Ratner, David M. Ermer, James R. Barnett, Kenneth J. Simon-Rose, Donald M. Murtha & Associates, Washington, D. C., for plaintiffs.

Edward F. Ward, Jr., Stephen E. Alpern, Donald F. Gilmore, Jr., Washington, D. C., James S. Petrie, Chicago, Ill., Milton C. Denbo, Eugene B. Granof, C. Richard Miscerendino, Vedder, Price, Kaufman, Kammholz & Day, Washington, D. C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

AUBREY E. ROBINSON, Jr., District Judge.

The lead case in this consolidated group of cases, *Donovan v. United States Postal Service*, No. 78–602, was filed on April 4, 1978, as a suit by the Department of Labor (DOL), against the United States Postal Service (USPS). DOL alleged that USPS violated the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*, said violations falling into two distinct categories, to wit: (1) *Smith/Kaplan*,[1] and (2) *Elia* violations.[2] Subsequent to the filing of the original complaint, private litigants Evans, *et al.*,[3] sued USPS for further alleged violations of the FLSA. Thereafter, DOL

---

[1] Those allegations resolved by Judge June Green's Orders and the settlement agreement in *Kaplan v. USPA*, No. 75–1505; *Smith v. USPA*, No. 75–1570, and various related cases consolidated before Judge June Green.

[2] Those allegations resolved by Judge Green's Orders and the settlement agreement in *Elia v. USPS*, No. 77–802, and various related cases before Judge Green.

[3] *Evans v. USPS*, No. 78–2415, filed December 22, 1978.

amended its complaint to include all but one of the *Evans* allegations.

DOL does not sue employers for alleged FLSA violations in a vacuum. Ordinarily, it conducts a thorough investigation of the employer's actions prior to initiation of litigation. The instant case was brought under unique circumstances, however. The two categories of FLSA violations incorporated in the original complaint had already been resolved in litigation brought by various private parties, and issues had either been resolved adversely to the USPS,[4] or submitted to the Secretary of Labor for arbitration.[5] Damages in excess of $66 million were awarded to Plaintiffs in those cases, and their attorneys were paid in excess of $3 million by USPS for attorneys fees and costs. Because of the procedural restrictions in the FLSA, however,[6] only party plaintiffs were compensated. This left over 400,000 USPS employees devoid of remedy for the FLSA violations.

DOL had three motives for initiating this lawsuit prior to a thorough investigation: (1) only it could sue in a class action on behalf of the remaining employees[7] (hereinafter referred to as non-plaintiffs), toll the statute of limitations against them, and insure that they were compensated for the FLSA violations, (2) the facts underlying the violations alleged in *Smith/Kaplan* and *Elia* were virtually unrefutable, and the alleged violations were indigenous to USPS' payroll and timekeeping system, and thus potentially affected all non-exempt USPS employees[8] and (3) Postmaster General Bolger specifically requested that DOL bring suit, and thus preclude further private lawsuits with accompanying attorneys fees.[9]

Subsequent to the filing of the lead case and the *Evans* litigation, a procedural quagmire developed. On February 12, 1979, the National Association of Letter Carriers (NALC) and certain named letter carriers moved to intervene in *Donovan*, alleging that USPS had entered into an oral "non-plaintiff agreement"[10] when it settled the *Smith/Kaplan* case. On February 16, 1979, Mozart G. Ratner, the attorney for the *Kaplan* plaintiffs,[11] moved to intervene in *Donovan*, on behalf of himself and four non-plaintiff letter carriers, also alleging the existence of a "non-plaintiff agreement." On July 10, 1979, *Atwood v. USPS*, No. 79–1808, was filed on behalf of the attorneys in *Smith*[12] and all non-plaintiffs, seeking specific performance of the alleged non-plaintiff agreement. On July 27, 1979, DOL moved to intervene in *Atwood*; on October 18, 1979, Ratner, *et al.* sought intervention in *Atwood*.

Rather than resolve the FLSA legal questions, which undoubtedly would have provided for more expeditious compensation to non-plaintiffs, all parties, with the exception of USPS, sought instead to litigate the existence *vel non* of the alleged non-plaintiff agreement. This Court initially denied the motions to intervene,[13] but was reversed

4. *See* Judge June Green's Orders and the settlement agreement filed in the *Smith/Kaplan* cases.

5. *See* Judge Green's Orders and the settlement agreement filed in the *Elia* cases.

6. 29 U.S.C. § 216(b).

7. *Id.*

8. *See* 29 U.S.C. § 203(e)(2).

9. *See* 29 U.S.C. § 216(b).

10. It is alleged by all plaintiffs that the non-plaintiff agreement requires USPS to enter into a consent judgment with DOL that (1) waives the statute of limitations and (2) compensates non-plaintiffs on the same basis as plaintiffs were compensated according to the Smith/Kaplan settlement agreement.

11. Ratner was also the attorney in *Barton v. USPS*, No. 78–68, a case consolidated with the *Smith/Kaplan* cases, and settled pursuant to the Smith/Kaplan settlement agreement.

12. The attorneys in *Smith* were also attorneys in cases consolidated with *Smith/Kaplan*, and incorporated in the settlement agreement. They were also attorneys in *Elia* and the related cases, in *Evans*, and in four cases subsequently consolidated with the instant action.

13. *See* Memorandum and Order dated June 27, 1979.

on appeal.[14] Thus, on June 4, 1980, the existence *vel non* of the alleged non-plaintiff agreement was brought to the forefront of the instant case. Immediately thereafter, the parties commenced discovery.

Because of the unique circumstances presented in this litigation,[15] this Court maintained close scrutiny on discovery,[16] consolidated all related litigation,[17] stayed resolution of the FLSA and related issues,[18] and clearly delineated the issue to be presented at trial.[19] Trial on the existence *vel non* of the alleged non-plaintiff agreement commenced on February 23, 1981, and concluded on March 18, 1981. This Court's Findings of Fact and Conclusions of Law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure follow.

## FINDINGS OF FACT

### I. Background

The FLSA was amended and became applicable to the USPS as an employer of covered employees, effective May 1, 1974. 29 U.S.C. § 203(d). At that time, USPS felt that the FLSA would have little impact on its day-to-day operations, and USPS'

general counsel offered no objection in Congress to the application of the FLSA to USPS. In fact, however, USPS' personnel practices were subtly but substantially out of compliance with the FLSA. The seriousness of these violations was apparently not realized by USPS until it was faced with defending a series of lawsuits alleging the violations in question.

These lawsuits fell into two categories, *viz.*, the *Smith/Kaplan* cases and the *Elia* cases. Plaintiffs in the *Smith/Kaplan* litigation contended that USPS violated the FLSA by (a) failing to include as hours worked time "suffered or permitted" by USPS management, and (b) failing to include certain required premiums in regular rate of pay calculations. Plaintiffs in the *Elia* litigation contended that USPS violated the FLSA by failing to include as hours worked time spent in certain study, travel, and training activities. An understanding of the principal actors in the *Smith/Kaplan* and *Elia* litigation, the disposition of *Smith/Kaplan* and *Elia* issues by the trial court, and the roles of the Department of Justice (DOJ) and DOL is imperative in order to scrutinize the operative facts presented in the instant case.

**14.** *See* the unpublished Judgment of the Court of Appeals in *Marshall v. U. S. P. S.*, No. 79–1471 (D.C.Cir. June 4, 1980).

**15.** This litigation is unique in many respects, *viz.* (1) government agencies are both plaintiff and defendant, (2) the negotiators of the Smith/Kaplan settlement agreement (and thus the alleged non-plaintiff agreement) were, with one exception, attorneys, (3) these attorneys represented either USPS or various unions in collective bargaining negotiations; (4) much personal animus exists, both among plaintiffs' counsel and between plaintiffs' counsel and attorneys for USPS; (5) DOL's enforcement action in the instant case is unprecedented, because, rather than conduct a thorough investigation, it is following a path previously blazed by private litigants; and (6) the Department of Justice played a less than adequate roll as attorney for USPS, and did not sufficiently evaluate all the governmental interests presented in this litigation. *See* also this Court's Order dated October 3, 1980.

**16.** *See* this Court's Orders dated November 14, 1980, October 3, 1980, September 29, 1980, September 26, 1980, September 19, 1980, July

10, 1980, July 9, 1980, July 3, 1980 (two orders), and June 16, 1980.

**17.** *See* this Court's Order dated September 15, 1980.

**18.** *Id.* The issues stayed include the FLSA legal issues brought in the lead case and Evans, as well as (1) whether USPS employees are entitled to additional leave and retirement benefits pursuant to the Postal Reorganization Act, 39 U.S.C. § 101 *et seq.* (*Brice v. USPS*, No. 79–691); (2) whether the Elia settlement agreement is void (*USPS v. Elia*, Nos. 80–1276 and 80–1683); (3) whether USPS has breached the Elia settlement agreement (*Elia v. USPS*, No. 80–1362); (4) whether USPS has diminished certain benefits to its employees in reprisal for the FLSA litigation (*Marshall v. USPS*, No. 80–1971); and (5) whether USPS' former attorney may obtain information pursuant to the Freedom of Information Act, 5 U.S.C. § 552, regarding DOL's involvement in the Elia agreement (*Nash v. DOL*, No. 79–2100).

**19.** *See* this Court's Order dated January 28, 1981.

## A. The Principal Actors (Private Plaintiffs)

Gerald M. Feder and Jules Bernstein are private attorneys practicing in Washington, D. C. Feder was intimately involved with the enactment of the FLSA amendments mentioned above. Bernstein was at all times herein relevant counsel to the Mail Handlers Division of the Laborers' International Union of North America. Both are partners in a law firm devoted to the practice of labor law, and unions are their primary clientele. Feder and Bernstein were responsible for filing *Smith, Elia*, and various related cases.[20] It is undisputed that, at least until March 27, 1978, they vehemently insisted that all non-exempt USPS employees be accorded equal treatment in any prospective settlement agreement. There were three motives underlying this insistence; namely, (1) as counsel for an employees' union, they viewed all employees as their clients, (2) they understood that significant labor strife might result if similarly situated employees were treated differently, and (3) the amount they could demand from USPS for attorney's fees would increase significantly if they represented all employees.[21]

Mozart G. Ratner is an attorney in private practice in Washington, D.C., and from 1970 through January 12, 1979, was general counsel to the NALC. He, too, is primarily devoted to the practice of labor law, and unions and/or employees are his primary clientele. Ratner was responsible for filing *Kaplan* and another related case.[22] It is undisputed that, at least until March 27, 1978, he vehemently insisted that all non-

plaintiff letter carriers be accorded equal treatment in any prospective settlement agreement, and that letter carriers be compensated at a higher rate than other USPS employees. Ratner tenaciously pursued these goals because (1) he was general counsel for the NALC and Joseph Vacca, then president of NALC, insisted that all letter carriers be treated equally, (2) he believed that the FLSA violations impacted harsher on letter carriers than on other USPS employees, and (3) the amount he could demand for attorney's fees was proportionate to the number of individuals he represented.[23]

## B. Principal Actors (USPS)

Four individuals played predominant roles in handling USPS' approach to the *Smith/Kaplan* and *Elia* cases: Postmaster General Bolger, Deputy Postmaster General Benson, Harvey Letter, and Joel Trosch. Bolger assumed the duties of PMG on March 15, 1978; at all relevant times prior to that date Bolger served as Deputy PMG. Benson assumed the duties of Deputy PMG on July 1, 1980; at all relevant times prior to that date Benson was Chief Postal Inspector. Harvey Letter served as USPS Associate General Counsel, Office of Labor Law, from 1972 through July of 1978. Joel Trosch has been an Assistant General Counsel in the Office of Labor Law since July, 1977. He was the chief litigation attorney in the *Smith/Kaplan* and *Elia* cases, and reported directly to the Associate General Counsel.

From the outset of the FLSA litigation, USPS was beset with countervaling policy considerations that impacted on its handling

---

**20.** Feder and Bernstein or individuals associated with their law firms also represent plaintiffs in *Evans v. USPS, Atwood v. USPS, Brice v. USPS* and *Elia v. USPS*, and defendants in *USPS v. Elia. See* notes 3, 12, and 19, *supra*.

**21.** Feder and Bernstein represented the employees as private attorneys not in their capacity as counsel for any unions. This obviated any attorney's fees problems resulting from *Nat'l. Treas. Employees Union v. Nixon*, 521 F.2d 317, 322 (D.C.Cir.1975). *See also Anderson v. IRS*, 648 F.2d 1 (D.C.Cir.1979).

**22.** *See* note 11, *supra*.

**23.** Ratner represented plaintiffs as a private attorney, not in his capacity as general counsel to NALC. This obviated any attorney's fees problems resulting from *Nat'l. Treas. Employees Union v. Nixon*, 521 F.2d 317, 322 (D.C.Cir. 1975). *See also Anderson v. IRS*, 648 F.2d 1 (D.C.Cir.1979).

of the FLSA issues. These considerations may be summarized as follows: [24]

(a) USPS recognized its responsibility to comply with the FLSA and treat its employees "fairly and equitably;"

(b) USPS further acknowledged that it had a broad responsibility to the rate-paying public to minimize its costs;

(c) USPS perceived that all benefits obtained by employees as a result of the FLSA litigation were windfalls,[25] and thus desired to keep payments to a minimum;

(d) Defendant sought to minimize the amount of attorney's fees to be paid to private plaintiffs' attorneys;[26] and

(e) USPS sought to avoid the payment of liquidated damages that could be assessed pursuant to the FLSA.[27]

While many of these considerations were contradictory in nature, and USPS' position regarding liquidated damages lacked a significant legal basis, they were all strongly felt by high ranking officials at USPS. Throughout the course of the *Smith/Kaplan* and *Elia* litigation, Trosch and Letter had difficulty establishing USPS' legal position and setting framework for settlement negotiations. This was due in part to the ambivalent nature of the policy considerations, but also resulted because no single USPS official had been authorized by the PMG to prioratize the above factors. They there-fore asked PMG Bolger to appoint an FLSA "czar." This request resulted in the appointment, on March 14, 1978, of Benson as chief negotiator for the USPS. Benson retained this position only until the *Smith/Kaplan* and *Elia* cases were settled in late March and early April of 1978, and was not involved in the FLSA litigation prior to March 14, 1978.

### C. Judicial Responses to *Smith/Kaplan* and *Elia*

On June 20, 1976, Judge June Green granted two of Plaintiffs' motions for partial summary judgment in the *Smith/Kaplan* litigation, ruling that USPS had violated the FLSA with respect to the "suffer or permit" and "regular rate" issues. At a hearing on February 20, 1977, Judge Green set April 30, 1977 as a cut-off date for filing written consents[28] to join as parties in *Kaplan* and *Smith*.

On March 17, 1977, Judge June Green issued an Order in *Kaplan/Smith* requiring USPS to perform an accounting of uncompensated hours of work and resulting overtime pay due each plaintiff for suffer or permit and regular rate violations found. On May 11, 1977, *Elia* was filed. On August 26, 1977, Feder and Bernstein filed an amended complaint in *Elia*, including class action allegations under Fed.R.Civ.P. 23.[29]

---

**24.** To the extent the factors are still relevant, USPS' position remains unchanged.

**25.** This perception was based on the belief that (1) the employees were always vigorously represented by their unions at collective bargaining negotiations, (2) benefits obtained as a result of the FLSA litigation would not have derived from a collective bargaining agreement, (3) the unions and their attorneys were the moving forces behind the FLSA litigation, and (4) in some instances the unions had either not opposed or had bargained for provisions that were inconsistent with the FLSA.

**26.** Plaintiffs' attorneys did not demand a flat amount or request that fees be based upon a computation formula involving a reasonable hourly rate multiplied by the amount of hours worked. Rather, they insisted that they be paid either a fixed amount (e.g. $100) *per plaintiff* or a percentage of the total amount awarded to the plaintiff class. Plaintiffs' attorneys therefore inextricably linked the amount of

their fee award with the size of the plaintiff class.

**27.** Notwithstanding the decision of the Court in *Laffey v. Northwest Airlines*, 567 F.2d 429 (D.C.Cir.1976), USPS perceived any imposition of liquidated damages in Smith/Kaplan as punitive in nature, and without merit since USPS did not intend to violate the FLSA.

**28.** Pursuant to the FLSA, 29 U.S.C. § 216(b), individuals must file written consents with the court before they can be considered party plaintiffs.

**29.** The Rule 23 class action allegations were presented in conjunction with a mandamus claim against the PMG to compel USPS to comply with the FLSA. Apparently, this novel contention was presented to the court in an attempt to obviate the necessity of filing written consent forms. *See* note 29, *supra.*

They also filed a new case, *Avery v. USPS*, No. 77–1472, on behalf of employees who were not plaintiffs in *Smith/Kaplan* or *Elia*.[30] *Avery* alleged the same violations as in *Smith/Kaplan* and *Elia*, including the Rule 23 class action allegations.[31]

On October 4, 1977, Judge Green entered a Memorandum Opinion and Order referencing her July 20, 1976, partial summary judgment orders. The October 4, 1977, Order set forth guidelines for implementing the accounting of backwages due plaintiffs "for the period between May 1, 1974, and the date defendant commences implementation of its new payroll system."

On December 14, 1977, Judge Green issued Orders in *Elia* and *Avery* denying plaintiffs' motions for class certification pursuant to Rule 23. On January 12, 1978, Judge Green issued an Order forbidding all plaintiffs' counsel from further notifying potential plaintiffs of the pending FLSA lawsuits. The latter two orders *de facto* precluded plaintiffs' attorneys from seeking compensation in court for USPS employees who were not plaintiffs in the various FLSA cases.[32] On March 10, 1978, the *Avery* plaintiffs filed a notice of appeal from the denial of their motion for Rule 23 class certification.

On January 13, 1978, Judge Green issued a Memorandum and Order in *Smith/Kaplan* finding that, as to all but one of the FLSA violations, USPS had no reasonable grounds for believing that its acts or omissions were not violative of the FLSA. The Court therefore assessed eighty percent (80%) liquidated damages against USPS. On February 7, 1978, Judge Green issued an Order in the *Smith/Kaplan* cases requiring that the new payroll system designed to remedy certain aspects of USPS' FLSA non-compli-

ance be operational nationwide on or before March 31, 1978. In addition, the Order stated that "if defendant fails to comply with this deadline, the Court will have no choice but to consider awarding additional relief as may appear equitable, just, and proper." On March 14, 1978, USPS filed a notice of appeal from the order awarding liquidated damages; on March 28, 1978, plaintiffs filed a cross-appeal. On March 31, 1978, the *Smith/Kaplan* litigation was settled.

### D. DOJ Involvement

DOJ served as counsel to USPS from the onset of the FLSA litigation until February 12, 1979, when then-Attorney General Griffin Bell authorized USPS to represent itself and/or retain outside counsel.[33] Unfortunately, DOJ did not impact significantly on this litigation. DOJ's approach to the *Smith/Kaplan* and *Elia* litigation may be summarized as follows:

(a) DOJ was predominantly concerned with the attorney's fee issue. Because of the plethora of litigation against the United States, which in many instances provided for the recovery of attorney's fees against the government, DOJ was extremely sensitive to the precedential value of a significant fee award;

(b) DOJ vehemently insisted that the integrity of the opt-in class action provision in the FLSA be maintained, and that Feder, Bernstein, and Ratner could not represent non-plaintiffs;

(c) DOJ opposed the use of "technical" defenses, such as the statute of limitations, by entities of the United States government, and thus objected to any assertion of those defenses by USPS;

(d) DOJ felt that DOL would have to become involved in order to protect the

---

**30.** Feder and Bernstein filed Avery using consent forms received after April 30, 1977.

**31.** While Judge Green cut off the date for filing additional consent forms in Smith/Kaplan, she could not preclude non-plaintiffs from filing new cases. Thus, Feder and Bernstein filed Avery and Ratner filed Barton, effectively circumventing the cut-off date.

**32.** Because the FLSA violations were indigenous to USPS' payroll and timekeeping system, virtually all USPS employees were potential plaintiffs. Thus, over 400,000 employees would be compensated for the FLSA violations by court order only if DOL filed a suit on their behalf. *See* 29 U.S.C. § 216(b), (c).

**33.** Subsequently, USPS retained private counsel.

interests of the non-plaintiffs and bar subsequent private FLSA litigation against USPS; and

(e) DOJ felt that any settlement with plaintiffs should be followed with a settlement on equal terms for non-plaintiffs.[34]

### E. DOL Involvement Prior to the Filing of the Lead Case

The Department of Labor became involved in *Smith/Kaplan* and *Elia* in late 1977 after Feder threatened to sue DOL for failing to monitor USPS' compliance with the FLSA. DOL's position on the *Smith/Kaplan* litigation may be thus summarized:

(a) DOL wanted to avoid the litigation threatened by Feder;

(b) DOL felt the need to protect all covered USPS employees;

(c) DOL wished to protect the USPS from additional private lawsuits;

(d) DOL was "outraged" because it perceived Feder, Ratner, and Bernstein as "holding [their] clients hostage" by demanding settlement of the attorney's fees issue contemporaneously with settlement of the FLSA litigation;

(e) DOL perceived itself as wearing "dual hats," i.e. that it was responsible to both USPS and its employees;

(f) DOL was concerned about the scope of a prospective settlement in a *DOL v. USPS* lawsuit;[35] and

(g) DOL wished, in January and February of 1978, to take an active role in settlement discussions between *Smith/Kaplan* Plaintiffs and USPS.[36]

### II. The Negotiations

As of January, 1978, progress towards settlement of the *Smith/Kaplan* and *Elia* litigations was virtually non-existent. USPS had in July of 1976, unilaterally commenced implementation of a retroactive payment system to compensate all employees for the "regular rate" violations alleged in *Smith/Kaplan*, but this action in no way enhanced the possibility of settlement. Negotiations were severely hampered by the conflicting stances of the parties,[37] significant distrust between USPS' attorneys and plaintiffs' attorneys,[38] plaintiffs' counsels' insistence on co-mingling the attorney's fees issue with discussions of the merits,[39] disputes among Plaintiffs' attorneys[40] and

---

**34.** DOJ was concerned that a settlement between USPS and DOL that was not equivalent to a prospective settlement of Smith/Kaplan would be "awkward," and would subject DOL to lawsuits from non-plaintiff USPS employees.

**35.** DOL perceived the "big issue" for Feder to be equal treatment for Smith/Kaplan plaintiffs and non-plaintiffs. DOL recognized that it would "be exposed" if it did not demand and receive at least equal treatment, and that Feder would being suit against DOL to force equality. DOL, however, ordinarily did not demand liquidated damages if the defendant in an FLSA litigation entered into a consent order.

**36.** There was no opposition to DOL participation in settlement talks from USPS. Plaintiffs' counsel insisted that such participation be limited to "observers' status," fearing that DOL might be too lenient on USPS. This fear allegedly resulted from DOL's statement that it wore "dual hats." Underlying DOL's attempted participation in Smith/Kaplan settlement talks was the uncertain effect such participation would have on attorney's fees.

**37.** See Section I, *supra*.

**38.** This distrust may have been the result of past litigation experience between USPS' attorneys and plaintiffs' attorneys. See note 39, *supra* negotiations concerning collective bargaining agreements between USPS and the employees' unions (represented by some of plaintiffs' attorneys), or by certain actions associated with Smith/Kaplan and Elia. Regardless, this distrust is evidenced not only by the testimony presented at trial, but also by the fact that certain 1977 reimbursement agreements between USPS and plaintiffs' attorneys were so carefully drafted as to provide for "tables," chairs, pencils, paper supplies, and pencil sharpeners."

**39.** Plaintiffs' insistence on the co-mingling of these issues apparently resulted from plaintiffs' attorneys' negative experiences occasioned by settlement of damages and litigation of attorneys' fees after remand in *United Federation of Postal Clerks v. Postmaster General*, 409 F.2d 462 (D.C.Cir.1969).

**40.** Ratner was at odds with Feder and Bernstein regarding ultimate entitlement to damages. Essentially, Ratner contended that his "clients," the letter carriers, were entitled to

less than adequate participation in the FLSA litigation by high ranking officials at DOJ. Judge Green's Orders in January and early February 1978 caused all parties to believe that settlement by March 31, 1978, would be in their best interests.[41]

## A. January 1978

Commencing in January of 1978, representatives of USPS, DOJ and DOL met in an effort to resolve FLSA issues as they impacted on non-plaintiff employees. All of the participants at the meetings understood that Feder, Bernstein, and Ratner (FB&R) claimed to be representing the non-plaintiffs. They also rejected this assertion.

DOJ's active participation in the meetings was precipitated by a letter to Assistant Attorney General Barbara Babcock from Feder. In the letter, Feder attempted to enlist Babcock's assistance in assuring that "all employees .... who are entitled to back pay as a result of the Postal Service's violations of the FLSA receive such back pay." Feder also expressed displeasure with the positions DOJ had taken as USPS' counsel.

DOL's participation in the meetings resulted directly from pressure asserted by Feder. On December 2, 1977, Feder wrote Donald Shire, Associate Solicitor for Fair Labor Standards at DOL, after Judge Green had intimated that she would not certify a class under Rule 23.[42] Feder outlined several actions he might be forced to take, including implementing DOL and "seeking to order DOL to enforce the FLSA [against USPS]."

On January 23, USPS officials met with Babcock and other DOJ attorneys. Babcock pointed out that the Postal Service was not in a good litigating position, and inquired about a "lump sum payment." This form of settlement appeared favorable to Babcock because it would dispose of the need for a costly accounting.[43]

Later that same day USPS officials, DOJ officials and DOL officials met. DOJ and DOL informed USPS that DOL could not settle a suit with USPS on less favorable terms than were received by Plaintiffs in *Smith/Kaplan*. DOL also told USPS that (1) a suit by DOL against USPS would pretermit subsequent private actions on the same FLSA violations, (2) that any statute of limitations defense should be waived, and (3) that if formulas were used as a basis for settling *Smith/Kaplan*, they should also be applied to non-plaintiffs.

On January 26, 1978, FB&R met with Babcock and another DOJ attorney; Babcock informed FB&R that she believed that all employees should be treated equally. She also suggested that the parties settle on a lump sum basis in order to avoid the costly accounting Ordered by Judge Green. On January 27, 1978, Feder informed Carin Clauss, Solicitor of DOL, about the substance of the January 26 meeting.

On January 30, USPS, DOJ and DOL attorneys met. DOL indicated that it might have to file suit against USPS to enforce the rights of non-plaintiffs. USPS expressed concern about paying liquidated

---

greater compensation than were other USPS employees represented by Feder and Bernstein. His unyielding insistence for greater compensation eventually led Feder and Bernstein to submit a proposed framework for settlement without consulting Ratner.

**41.** Plaintiffs' attorneys were effectively precluded from representing the non-plaintiffs in court by Judge Green's January Orders. *See* note 33, *supra*, and accompanying text. Thus, ultimate resolution of the issues by the Court would not directly benefit non-plaintiffs. On February 7, 1978, Judge Green ordered USPS to effectuate compliance with the FLSA (vis-a-vis Smith/Kaplan) by March 31, 1978, or face the possibility of additional damages. USPS knew it could not comply with the Order, and

assumed that Judge Green would impose 100% liquidated damages if the case was not settled. Thus, the primary motive forces militating towards settlement were (1) FB&R's desire to resolve issues for all employees and (2) USPS' desire to avoid assessment of additional liquidated damages.

**42.** Judge Green eventually so ruled. *See* note 33 and accompanying text.

**43.** Estimates for an accounting in Smith/Kaplan were in the $14 million range; estimates for an accounting for all employees for Smith/Kaplan violations were on the order of $49 million.

damages to non-plaintiffs, and suggested that interest payments would be acceptable. Harvey Letter stated that "USPS intends to pay all employees who are entitled, whether or not they are plaintiffs." USPS' position regarding non-plaintiffs, however, was that they were entitled to less back wages than plaintiffs. This position, which was unsupported by any empirical evidence, resulted from USPS' assumption that those individuals with significant FLSA claims would have opted into *Smith/Kaplan*.

## B. February 1978

On February 7, 1978, the same day that Judge Green established a March 31 cut-off date for implementation of a newly designed payroll system,[44] DOL, DOJ and USPS attorneys met to review issues that would be discussed at a meeting with FB&R scheduled for the following day. At this meeting, Carin Clauss told USPS officials that if they did not agree to pay non-plaintiffs liquidated damages, a subsequent *DOL v. USPS* lawsuit would require a full accounting. Clauss also indicated that USPS would have to waive the Statute of Limitations in order to settle with DOL.

On February 8, 1978, USPS, DOL and DOJ officials met with FB&R. This was the only meeting attended by all relevant parties prior to execution of the *Smith/Kaplan* and *Elia* settlement agreements. The primary focus of the meeting centered around representation of the non-plaintiffs. USPS and DOJ asserted that FB&R did not represent them; Feder responded that until the Court of Appeals ruled on the Rule 23 class certification issue, he represented all employees. Clauss contended that DOL represented the non-plaintiffs, and attempted to assure FB&R that DOL intended to protect the non-plaintiffs' interest. FB&R were suspicious about DOL's role however, because Clauss stated that DOL wore "dual hats." FB&R therefore insisted that DOL's role be limited to that of "observer status."

On February 9, Feder and Bernstein wrote Babcock that, based on the February 8th meeting, discussions at a February 18th meeting would involve five issues, to wit:

(a) the Government's willingness not to assert the statute of limitations as an affirmative defense with respect to any part of the claim of any person employed by the Postal Service since May 1, 1974, (b) the Postal Service's willingness to apply the summary judgments rendered by Judge Green in *Smith* and *Kaplan*, with respect to substantive matters, with respect to liquidated damages, as well as the accounting order, to all persons employed by the Postal Service since May 1, 1974 whether or not individually designated as parties plaintiff in these actions, (c) settlement, as opposed to litigation, of the attorneys' fees questions, (d) exploration of the possibility of limiting the Postal Service's obligation to conduct a full accounting for each plaintiff, for each workweek, of all uncompensated time on-the-clock, or, in the alternative, an agreement to apply an agreed upon standard rate of pay for uncompensated hours on-the-clock for each employee [and] (e) exploration of the Postal Service's willingness to forego the opportunity to challenge any individual employee's time records under the provisions of paragraph 2 of the Court's Order of October 4, 1977.

They also stated that "plaintiffs are prepared to discuss the implications of the Court's Order of February 7, 1978, with respect to the deadline of implementation of the redesigned payroll system," and that "based on the above understanding, counsel for plaintiffs is [sic] prepared to proceed further with these discussions."

On February 9 and February 21, USPS, DOJ and DOL attorneys again met. Clauss wanted USPS to establish a formula for payments to non-plaintiffs based on an accounting for plaintiffs, should USPS and FB&R fail to settle. USPS asked DOL for a statement of its position, and indicated that it would waive the statute of limitations for non-plaintiffs to February 8, 1975. This waiver was reduced to writing in a letter from PMG Bolger to Clauss dated February 23, 1978.

---

44. *See* page 878, *supra*.

On February 28, Solicitor Clauss wrote a letter to Harvey Letter, explaining DOL's position regarding settlement of the potential *DOL v. USPS* litigation. Ms. Clauss wrote, *inter alia*, that DOL would require USPS to (1) waive the statute of limitations back to May 1, 1974 and (2) pay 80% liquidated damages to the non-plaintiffs. In addition, Clauss stated that

> [t]he guiding principles of a resolution, as we have repeatedly emphasized, must be that back wages be distributed to underpaid employees as soon as possible, and that in the payment of back wages all employees—plaintiffs and non-plaintiffs alike—must be granted relief according to essentially the same computation formulas. In addition, it goes without saying that where the Postal Service pay practices are not yet in compliance with the FLSA, they must be brought into compliance immediately. (emphasis in original).

Finally, Clauss noted that DOL was prepared to file a complaint against USPS, in order to terminate the right of any employee to file a private lawsuit.

February was an active month for USPS officials. These officials were debating, *inter alia*, their potential liability to both plaintiffs and non-plaintiffs and the possibility of "equal treatment" for non-plaintiffs. Some high ranking USPS officials recommended proceeding· expeditiously with an accounting for plaintiffs, while others encouraged settlement to avoid the costs of the accounting. While there was unanimity regarding "equal treatment" for the non-plaintiffs, there was no consensus regarding the form of equal treatment. Some officials tended to favor application of some formula to both plaintiffs and non-plaintiffs. Others supported an accounting for plaintiffs, with settlement for non-plaintiffs based on the average payment based to the plaintiff class. Others supported a full accounting, believing that application of either of the two other alternatives would result in a windfall for non-plaintiffs, and thus not constitute equal treatment. All of these possibilities were embraced in Clauss' letter to Harvey Let-

ter, so long as the statute of limitations was waived and 80% liquidated damages were provided.

### C.   March and Early April 1978

As of the beginning of March 1978 the parties' respective positions were unchanged. FB&R still maintained that (1) they represented the non-plaintiffs, (2) non-plaintiffs should be treated as if they were plaintiffs, and (3) computation of attorneys fees should be based on either a percentage of the total amount of damages paid or a fixed amount per employee. USPS still perceived that (a) any recovery would be a windfall for the employees, (b) payment of liquidated damages should be avoided, and (c) FB&R's attorneys' fee demands were outrageous. USPS did support the proposition of equal treatment, but there is no evidence indicating either that some formula for applying this concept had been arrived at, or that the concept represented any change in position. DOL was still ambivalent about suing another Federal agency, and evidenced no intention to participate in the ongoing FLSA litigation. DOJ ostensibly was USPS' counsel, but was put in an increasingly precarious position as advocate because of DOL's extended activity.

On March 1, Feder and Trosch met to discuss the pending litigation. Without conceding any of their respective stances regarding representation of the non-plaintiffs, they discussed the possibility of quick payouts to plaintiffs, with delayed payment to non-plaintiffs. This concept, favorable to USPS, was acceptable to Feder because the verification process (insuring that each plaintiff was in fact an employee) for plaintiffs would be completed far sooner than any verification process for non-plaintiffs.

On March 15 Bolger was appointed PMG, and on or about that date Benson was appointed as Chief Negotiator for USPS. This appointment was made because high USPS officials had difficulty reaching a consensus on many issues, and resolution of those issues would be necessary in order to reach settlement in *Smith/Kaplan* and *Elia*. Benson was given broad latitude to settle

the FLSA litigation, and the only restriction placed on his authority was that the settlement had to be ratified by PMG Bolger.

Almost immediately thereafter, Benson was fully briefed on the issues by Trosch and Letter. On May 17, two meetings were held at USPS headquarters regarding FLSA matters. The first meeting involved discussions with representatives of the postal unions concerning USPS' proposed revisions to the payroll timekeeping instructions (F–21 and F–22 handbooks). Ratner and Feder and Benson were all at that meeting, and Benson requested that they all meet later that day to discuss *Smith/Kaplan*. At the afternoon meeting, Benson described his responsibilities, indicated that USPS would like to settle *Smith/Kaplan* by March 31, and suggested that a statistical sample might be employed to replace the full accounting ordered by Judge Green. Ratner was skeptical about the use of a statistical sample, and Benson offered to let FB&R's statisticians review any proposed sample.

The next subject discussed was attorneys' fees. USPS indicated that it was following DOJ's lead on this subject, and the DOJ representative was unprepared to address the issue. Ratner felt "betrayed" and Bernstein felt that he had been "sandbagged" because they had understood USPS as ready to negotiate all five points addressed in Feder's February 9th letter to Babcock. Ratner stormed out of the meeting; Feder and Bernstein followed shortly thereafter.

Following the meeting, Benson realized that he did not fully comprehend all the ramifications in the FLSA litigation. He asked Trosch to outline the various issues, describing FB&R's desires, USPS' positions, and "the gulf in between." Meanwhile, on March 21, Feder wrote Babcock concerning the aborted March 17 meeting. Feder indicated that FB&R were prepared to "resume discussions at any time the Postal Service is prepared to discuss all of the issues enumerated in our February 9, 1978 letter."

It is imperative at this point to outline the various roles played in the negotiations. Both sides utilized the "good cop-bad cop" approach to negotiating. Feder and Trosch were the "reasonable" negotiators; Ratner, Bernstein, and Letter were rigid. Benson's role was less important in the negotiation process. While only he could make policy decisions and recommend settlement to Bolger, settlement of *Smith/Kaplan* in fact hinged on the Feder/Trosch relationship. Each understood that the other had to "deliver" the apparently inflexible members of their negotiating team and that they had to bridge the gulf separating the parties.

After the aborted meeting, both Feder and Trosch understood that Trosch had to deliver a sign of good faith to FB&R. This sign was in fact delivered on March 24, the next *Smith/Kaplan* negotiation session. At the meeting, Benson presented a document known as the "Concepts Paper," which was prepared by Trosch and approved by Bolger. The Concepts Paper stated, *inter alia*, that

1. The Postal Service will not assert the statute of limitations [against any employee with respect to the *Smith/Kaplan* issues];
2. The Postal Service will apply the summary judgments on the issues ruled on by the Court in *Smith* and *Kaplan* to all ... [employees]. Such determinations shall be made applicable pursuant to a stipulation for a consent order to be submitted jointly by the Postal Service and the Department of Labor on behalf of employees who are not consenting plaintiffs in [the pending FLSA litigation].
3. The accounting of plaintiffs' hours directed by the Court in its October 4, 1977 Order shall be satisfied by the statistical sampling described in the attached document .... Liquidated damages in the amount of 80% shall then be applied as directed in the Court's October 4, 1977 Order.
5. The attorneys for *Smith/Kaplan* plaintiffs shall join the Postal Service in requesting that the Court extend the March 31, 1978 date ... for implementation of the payroll redesign system....

6. Attorneys for plaintiffs in [the *Smith/Kaplan* litigation] shall receive as attorneys fees [sic] for all services performed prior to April 1, 1978, the sum of $850,000. . . .

7. The attorneys for plaintiffs shall be reimbursed for expenses. . . .

8. The parties to *Elia* shall continue to negotiate to accomplish a satisfactory resolution of the *Elia* complaint. . . . The parties agree that, whatever method is selected to arrive at the number of hours for which plaintiffs are to be compensated, the amount of compensation, exclusive of liquidated damages, if any, shall be determined by agreement of the parties, or, in the absence of an agreement, by submission of the issue to the Court.

9. The parties [in *Elia* ] agree that unresolved issues related to the manner in which substantive provisions of the FLSA and the regulations of the Department of Labor, apply to [the issues presented in *Elia* ] shall be referred to the Secretary of Labor or his designee for resolution. . . .

10. Those FLSA non-exempt persons who were postal employees at any time on or after May 1, 1974, and not consenting plaintiffs in [*Smith/Kaplan* or *Elia* ] shall be granted relief in accordance with the computation formulae determined either in *Smith/Kaplan* or *Elia*, as applicable, and shall receive such relief pursuant to a stipulation for consent orders submitted to the Postal Service and the Secretary of Labor.

11. It is agreed that all notices of appeal that have been filed will be withdrawn.

12. Agreement on these concepts is contingent upon agreement on all items, and the concurrence of the Secretary of Labor.

Presented with the Concepts Paper was a proposed statistical sampling for the suffer and permit (*Smith/Kaplan* ) violations.

Upon receipt of the Concepts Paper, FB&R left the meeting room to caucus. During their caucus, they carefully reviewed the document. All viewed the Concepts Paper favorably, and Feder understood its presentation as a sign of good faith from Trosch. Nevertheless, FB&R were not satisfied with either the sampling provision or the attorneys' fees award, and Feder and Bernstein strongly opposed linking the *Smith/Kaplan* litigation with *Elia*. This linkage was opposed because Ratner was not an attorney in *Elia*, and Feder and Bernstein wanted him to play no part in that litigation.

FB&R prepared an agreed-upon response, and Bernstein was selected to present the reaction to USPS. Bernstein's section is important, in light of the parties' negotiation strategy. Had FB&R decided to present a favorable reaction to the Concepts Paper, Feder undoubtedly would have been the spokesperson. Instead, they decided to take an inflexible stance, and Bernstein was the logical selection.[45]

Consistent with Bernstein's role, he did not voice approval for any of the paragraphs in the concepts Paper that were acceptable to FB&R. Rather, he described their reaction as "very negative" and he proceeded to reject the linkage, sampling, and attorneys' fees provisions. He concluded by stating that FB&R would prepare a proposal for settlement of *Smith/Kaplan* and present it to USPS on Monday, March 27. Before adjourning the March 24 meeting, Feder stated that he was pleased that USPS recognized the need for equal treatment of all employees. DOJ attorney Jaffe responded that USPS was only dealing with FB&R concerning plaintiffs, and that they did not represent all employees. Feder responded that the issue was not with whom USPS was dealing regarding the non-plaintiffs, but rather that USPS had agreed to grant them equal treatment through a DOL lawsuit.

Immediately following the meeting, FB&R went to Feder's office to discuss the terms of the proposal to be submitted on the following Monday, March 27. They de-

---

**45.** Ratner could not have been the spokesperson because he could not have voiced credible opposition to the linkage of Elia and Smith/Kaplan.

cided to slightly modify Judge Green's prior accounting order for determining USPS liability and the drafting of the proposal (hereinafter referred to as the Three Page Proposal) was left to Feder. That same evening Feder contacted Trosch and set up a private meeting for the next morning. Feder understood that, given their reaction to the Concepts Paper, FB&R needed to show flexibility.

On the morning of March 25, Feder and Trosch met privately to discuss settlement of *Smith/Kaplan* and *Elia.* They discussed their relationships with their respective fellow negotiators, and Feder stated that since Trosch had managed to "deliver," he had a duty to make as significant a concession as the Concepts Paper represented. Trosch asked Feder for a "sign of good faith," which Feder indicated would be forthcoming on Monday. Feder indicated, however, that he and Bernstein could not agree to linkage of *Smith/Kaplan* and *Elia*, and stated that if the Government was not "entrenched" in its approach to fees then the parties could proceed in stages.

On the afternoon of March 25 Feder and Bernstein met and decided on "lump sum" approach to settling *Smith/Kaplan.* Accordingly, Feder prepared a lump sum settlement proposal establishing three funds for plaintiffs in *Smith/Kaplan* (hereinafter referred to as the Three Funds Proposal). Feder and Bernstein considered this proposal to be the "positive sign" requested by Trosch, because it would obviate the need for either an accounting or a sampling. They used a universe of party plaintiffs, rather than employees, to assign figures to the three funds because they did not want to "scare Mr. Benson with the larger figures."

In the morning of March 27, the Three Page Proposal was delivered by messenger to USPS. Attached to it was a letter from Feder to Trosch stating

[t]hese proposals are predicated on our understanding that the "Postal Service will not assert the statute of limitations [against any employee with respect to the *Smith/Kaplan* issues]" and that the

"Postal Service will apply the summary judgments on the issues ruled on by the Court in *Smith* and *Kaplan* to all [employees]."

The portions of this letter in quotation marks were taken from points one and two of the Concepts Paper.

Trosch and Letter reviewed the Three Page Proposal and the cover letter. Letter's reaction was negative. He expected that any FB&R proposal would provide the basis for an agreement because Feder had indicated to Trosch that he was prepared to make a significant concession. Benson never reviewed either the Three Page Proposal or the cover letter however, because by the time he was presented those documents Feder and Bernstein wanted to see him to discuss the Three Funds Proposal.

Feder and Bernstein then met with Benson, Trosch, and Letter in Benson's office, and presented USPS with the Three Funds Proposal. They told the USPS officials that the Three Page Proposal was "not much of an offer," but explained that they were having trouble with Ratner because of his insistence that letter carriers deserve'd a greater proportion of damages than did other USPS employees. They informed the USPS officials that Ratner had not been informed about the Three Funds Proposal, and that they were prepared to explore it with Ratner only if it appeared to be a reasonable way to reach settlement of *Smith/Kaplan.* Benson replied that the Three Funds Proposal appeared worth pursuing, and that USPS would get back to them.

Following the March 27th meeting, Benson forwarded the Three Funds Proposal to USPS' Finance Department for a determination of its financial impact. Assistant PMG for Finance Gentile made cost projections for five alternatives USPS might pursue towards settlement; each projection was calculated both for plaintiffs and for all employees. USPS Alternative #1 projected the costs of applying the Three Fund Proposal's approach to *Smith/Kaplan* and to non-plaintiffs. This projection was close to USPS' determination of its overall FLSA liability for the *Smith/Kaplan* issues.

Benson reviewed the cost figures and met with PMG Bolger. They decided to pursue Alternative # 1 with FB&R (and thus negotiate on the basis of the Three Funds Proposal) because it was close to Gentile's estimate of overall liability. Bolger then authorized Benson to settle the *Smith/Kaplan* litigation for up to $55 million, and attorneys' fees of up to 3%.

On March 28 Feder and Ratner discussed the possibility of a lump sum approach to settlement. Feder did not inform Ratner that he had already submitted a proposal to USPS. Ratner indicated that he would be receptive to a lump sum approach only if letter carriers received a favorable differential based on a sampling of USPS employees.

From March 27 until the afternoon of March 31, negotiations in *Smith/Kaplan* were tabled so that a settlement agreement in *Elia* could be negotiated. Feder and Bernstein met numerous times with Benson, Trosch, and Letter in order to dispose of *Elia.* In spite of Feder and Bernstein's efforts to get USPS to settle the *Elia* claims for all employees, the final settlement resolved claims only for consenting plaintiffs. Settlement in *Elia* was filed in the morning of March 31, 1978.

On March 30, at USPS' invitation, Ratner and James Barnett (then associate general counsel for NALC) met with USPS representatives to discuss settlement of the *Smith/Kaplan* litigation. At this meeting, Letter explained Feder's Three Funds Proposal, and handed him a copy. Ratner was upset with the proposal, which he dubbed "illicit," because it did not provide for a differential for letter carriers. Benson did not react favorably to Ratner's suggestion of a statistical sample to determine the need for and percentage of a differential.

The final *Smith/Kaplan* negotiations session began in the afternoon of March 31 and concluded in the morning of April 1. Benson opened the meeting by presenting a monetary offer based on the Three Funds Proposal. Ratner refused to proceed, contending that there should be a full accounting in order to obtain a favorable differential for the letter carriers. Bernstein ascertained that Ratner posed the only problem to resolution of *Smith/Kaplan*, and suggested that plaintiffs caucus. Bernstein then suggested a differential of seven-to-six in favor of the letter carriers, which Ratner eventually accepted.[46]

At the resumption of the negotiations session, Feder told USPS that plaintiffs had agreed to the seven-to-six differential. USPS voiced no objection to the differential. The negotiations concerning the amounts allocated to the three fund continued, and the parties reversed their roles concerning the non-plaintiffs. FB&R tried to eliminate the non-plaintiffs from discussion, in order to reduce the amounts discussed; Benson kept extrapolating figures presented by plaintiffs' attorneys to the full universe of all employees to inflate the total amount.

Ultimately, FB&R made the following offer:

(1) $53 million compensation for the *Smith/Kaplan* plaintiffs if USPS implemented its redesigned payroll system by May 20, 1978, in compliance with the FLSA, with a provision for $3 million additional compensation (an additional 10% in liquidated damages) if compliance occurred later;

(2) 80% liquidated damages on retropayments made to the *Smith/Kaplan* plaintiffs;

(3) a seven-to-six differential in favor of the letter carriers; and

(4) 5% of the total damages award for attorneys' fees. USPS requested a recess to consider the offer, and Benson went to secure Bolger's approval for acceptance of the offer. During the session, Benson had extrapolated FB&R's settlement offer to all employees, in order to advise the PMG of the cost of universal application. This extrapolation amounted to $319,500,000, which was within the range of USPS' anticipated

---

**46.** Ratner was visibly disturbed by the paucity of a seven-to-six differential, but was persuaded to accept it by NALC President Vacca.

He and Louis Weisenberg, counsel in the California cases, signed two side bar agreements accepting the seven-to-six differential.

FLSA liability on the *Smith/Kaplan* issues. Bolger accepted the offer, and Benson communicated USPS' acceptance to FB&R.

Benson imposed three conditions on ultimate settlement, only one of which is important here. He insisted that FB&R "not oppose USPS at DOL," meaning that FB&R should not oppose or delay DOL's lawsuit against USPS. FB&R agreed to this condition.

After reaching agreement in *Smith/Kaplan*, while the settlement was being drafted, several events essential to this litigation ensued. First, Feder asked Benson to apply the settlement agreement to the plaintiffs in the *Elia* cases. Benson responded that they "would be taken care of" in DOL's suit. Feder replied that he represented those employees, and that it was important to him that any compensation they received result from the settlement agreement, and not from the DOL suit. Feder indicated that he and Bernstein would forego any claim to attorneys' fees for the inclusion of the approximately 20,000 *Elia* plaintiffs, and that their inclusion would not affect the distribution of attorneys' fees. Benson then agreed to apply the *Smith/Kaplan* agreement to the *Elia* plaintiffs. He so agreed without consulting Bolger, even though their inclusion increased USPS' liability in excess of $10 million.

Second, Bernstein requested Benson to include employees whose FLSA consent forms he had received but had not filed. Benson refused to include those employees, stating that Bernstein did not represent them, and that they would be "taken care of" in DOL's lawsuit.

Third, Ratner told the USPS negotiators that Joe Vacca, President of NALC, wanted the non-plaintiffs and plaintiffs to be accorded equal treatment. The officials responded that the non-plaintiffs would be taken care of in DOL's suit.

Fourth, Ratner demanded that Benson include the employees whose FLSA consent forms he had received but had not filed. Benson told Ratner that "a deal is a deal," and that he would not reopen negotiations. Ratner relented.

Fifth, Bernstein asked Benson to "reduce the commitment of the Postal Service that there would be equal treatment to all postal workers regardless of whether they had submitted consent forms to any counsel in writing." Benson refused to do so, indicating that FB&R did not represent employees whose consent forms were not filed with the Court.

On April 1, 1978, the *Smith/Kaplan* settlement agreement was signed. It did not mention USPS' liability to non-plaintiffs. The settlement terms embodied in the *Smith/Kaplan* and *Elia* agreements achieved the underlying purposes in the Concepts Paper. The three areas of dispute —linkage, an accounting, and attorneys' fees—were resolved. Linkage was unnecessary because both sets of cases were settled. The need for an accounting was obviated, and the financial cost of settlement was similar to that anticipated in the sampling proposal in the Concepts Paper. The attorneys' fees issue was resolved, albeit at a substantially higher cost to USPS. Moreover, all of USPS' specific objectives were achieved. USPS received an extension of time to implement the payroll redesign system, and thus avoid further liquidated damages. All notices of appeal were withdrawn, and both *Smith/Kaplan* and *Elia* were dismissed with prejudice. Finally, the lawsuit which USPS sought to preclude further private litigation was brought by DOL and USPS knew DOL would agree to apply the terms of the *Smith/Kaplan* agreement.[47]

On March 31, prior to commencement of the *Smith/Kaplan* settlement negotiations, Bolger spoke with Solicitor of Labor Clauss. He informed her that the private FLSA litigation was settled,[48] requested that DOL

---

47. USPS was cognizant of DOL's desire to settle any *DOL v. USPS* litigation on the basis of a Smith/Kaplan agreement. *See* pp. 881–882, *supra*.

48. While Bolger's statement was a bit premature, he had been informed by letter and Benson that Elia had been settled and that they

file suit against USPS under the FLSA, and explained that USPS desired such a suit to avoid the filing of further private suits and precluded payment of additional attorneys' fees. Clauss told Bolger DOL would file such a suit. On April 4, 1978, DOL sued USPS, alleging violations identical to those alleged in *Smith/Kaplan* and *Elia.*

### III. Relevant Post Settlement Actions

The parties have presented a plethora of evidence designed to reflect the post-settlement "understanding" of the parties. The relevant portions of this evidence is summarized below:

The *Marshall* complaint, filed on April 4, contained no allegations even remotely related to the alleged non-plaintiff agreement. In fact, at no time in 1978 did FB&R inform *anyone* about the existence of the alleged agreement. Rather, until January of 1979 FB&R consistently took the position that (1) the non-plaintiffs would be paid as a result of the *Marshall* litigation, and (2) exactly how compensation would be ascertained remained to be determined in *Marshall.* FB&R were aware of the events then ensuing in the *Marshall* litigation, and they also understood that certain activities (e.g. DOL's consideration of a statistical sampling and resolution of the liquidated damages issues by summary judgment) were inconsistent with the alleged non-plaintiff agreement. Yet they did nothing.[49] Their inaction is inconsistent both with the existence of a binding agreement and the tenaciousness with which FB&R consistently pursued an objective. Both their inaction and their initial failure to alert DOL about the existence of the alleged non-plaintiff agreement have not been credibly explained.

Meanwhile, USPS activities immediately after ratification of the *Smith/Kaplan* agreement indicate that the Postal Service intended to apply the *Smith/Kaplan* formula to the DOL lawsuit. Letter, in an interview by a reporter from *The Wall Street Journal,* stated that USPS' position was to compensate all its employees for FLSA violations, and that it was reasonable to anticipate that the DOL lawsuit would be settled on the same terms as *Smith/Kaplan.* Likewise, Benson was quoted in a USPS publication as saying that the DOL lawsuit would insure consistent treatment for all employees and that the PMG insisted on fair and consistent treatment for all employees.

### IV. Summary

A. *The Final Days.* An understanding of the negotiations proceeding and the underlying meaning of the Concepts Paper is vital to a determination of the existence *vel non* of the alleged non-plaintiff agreement. In this regard, Feder's testimony is most credible and crucial. He stated, *inter alia* :

I read this document as a carefully constructed document to be presented to counsel for plaintiffs as part of an effort by the Postal Service to continue its pretense that they were not recognizing us as representatives of non-plaintiffs. . . .

The pretext that I saw was not a pretext necessarily inherent in this document. It was a pretext of sitting in a room giving

---

expected imminent settlement of Smith/Kaplan.

**49.** After the *Smith/Kaplan* plaintiffs were paid, non-plaintiff letter carriers sent inquiries to Ratner. His response is probative. A form letter he prepared states:

We are in receipt of your letter and consent form in *Kaplan, et al.* If you had indeed sent us a consent form in March of 1977, it would have been filed with the court, and you would have received a check along with your fellow workers. I have carefully checked my list of plaintiffs and your name is not on it.

The consents you sent us this month are worthless. The case has been settled and we have not been able to file any additional consents with the court since the Settlement Agreement was entered into.

The Secretary of Labor has filed a suit against the United States Postal Service on behalf of all letter carriers who did not qualify as plaintiffs in the *Kaplan, et al.* FLSA actions. That case is now pending in the United States District Court for thlumbia styled *Marshall v. United States Postal Service,* Docket NO. 78–602.

The membership will be informed about the progress of the Department of Labor suit through the *Postal Record* or by Bulletin.

us a document which was labeled "Concepts for Settlement of the Fair Labor Standards Act Cases" which included proposals to pay all non-plaintiffs on the basis of equality, and then pretend that we don't represent non-plaintiffs as they are sitting there negotiating with us.

I thought this was a carefully constructed document designed to communicate a message to us which is that the United States Postal Service was prepared finally to acknowledge its liability to treat all of its employees equally but to do so in a way which did not recognize us as the representatives of the non-plaintiffs so they could deprive us of any opportunity for fees with respect to the non-plaintiffs' recovery.

. . . . I saw this document as a document designed to communicate a message to us as to what the Postal Service's intentions were with respect to treatment of non-plaintiffs equally, and that in that context they were putting forth their thoughts on all sorts of other issues including one they wanted more than many of the others, which was short-circuiting of the accounting process, one way or the other.

I did not look at this as a written legal offer from the Postal Service in the ordinary contract sense. I looked at it as something that was carefully designed, . . . to maintain a fiction of not dealing with us about thoughts, proposals, recommendations that they were including in a document which they were giving only to us.

My perception of the document was a perception of someone whose background is negotiation in a political context, more so than anyone whose background is negotiation of highly stylized formal contracts, and I perceived that with this background. I saw this as a document intended to convey messages to me. I saw this as a document which I believed reflected a deliverance by Joel Trosch of the issues he knew we felt most strongly about and deliverance to me in a very carefully constructed piece of paper which did not on its face recognize us as representatives of non-plaintiffs.

They [USPS] were trying to say to me that I was not going to get fees for any payments being made to non-plaintiffs. During this entire period of time I was not thinking of the negotiations and the meeting and the discussions in terms of contract or agreement or non-plaintiffs agreement or plaintiffs agreement. I believe after the meeting on March 24 at which the Concepts Paper was presented that the Postal Service had agreed to provide equal treatment to the non-plaintiffs. That belief was confirmed by subsequent conduct of the parties in the negotiations. I do not recall at any point in time during that entire period thinking of it in contract terms.

B. *Post-Settlement Activities.* The post-settlement activities reflect several highly relevant facts, *viz.* (1) USPS intended to give the non-plaintiffs fair, equitable, and consistent treatment, and (2) FB&R assumed that they lacked the power and/or the responsibility to force USPS to apply the *Smith/Kaplan* agreement to non-plaintiffs.

## CONCLUSIONS OF LAW

Jurisdiction over the parties and the subject matter is predicated upon 28 U.S.C. §§ 1331, 1339 and 39 U.S.C. § 409. This Court's jurisdiction is not disputed.

The FLSA became applicable to USPS on May 1, 1974. 29 U.S.C. § 203(d). On April 1, 1978, USPS entered into a written settlement agreement in certain FLSA lawsuits referred to herein as the *Smith/Kaplan* litigation. Plaintiffs allege that during the *Smith/Kaplan* settlement negotiations, USPS entered into a separate unwritten agreement, the alleged "non-plaintiff agreement," which obligates the Postal Service to pay the non-plaintiff USPS employees the amounts paid to the *Smith/Kaplan* plaintiffs under the terms of the agreement. For the reasons set forth below, the Court concludes that although all the parties to the *Smith/Kaplan* agreement assumed that that agreement would be ap-

plied to non-plaintiffs, USPS did not enter into a binding obligation to do so.

### I. The Parol Evidence Rule

USPS alleges that the Parol Evidence Rule precludes consideration of much of the evidence present at trial. This allegation lacks vitality. The Parol Evidence Rule requires that "[w]hen two parties have made a contract and have expressed it in writing to which they have both assented as the complete accurate integration of that contract, evidence . . . of antecedent understandings and negotiations will not be admitted for the purpose of barring or contradicting the writing." *Murray v. Lichtman,* 339 F.3d 749, 751 (D.C.Cir.1964). The alleged non-plaintiff agreement, if it existed, would neither vary nor contradict the *Smith/Kaplan* accord. Rather, it would apply the agreement to a broader base of employees. Thus, the parol evidence rule is inapplicable to this litigation.

### II. Contract Law

It is undisputed that no written non-plaintiff agreement was entered into by the parties. Plaintiffs contend, however, that the alleged non-plaintiff agreement is enforceable either as an express oral agreement or as an implied contract. It is clear that under either theory, plaintiffs must prove, by a preponderance of the evidence, the fundamentals of offer, acceptance, and consideration. As the Tenth Circuit stated in *Kirk v. U.S.,* 451 F.2d 690, 695 (10th Cir. 1971):

> [T]he elements of an express and an implied contract are the same. The difference between them is one of proof. The express contract is proven by testimony showing the promise and the acceptance, whereas the implied contract is inferred from the acts of the parties and other circumstances showing an intent to contract.

*See also Bloomgarden v. Coyer,* 479 F.2d 201, 208 (D.C.Cir.1973).

Plaintiff-Intervenor Ratner contends that Feder's February 8 and March 21, 1978 letters to Babcock established an "offer" to negotiate with USPS so long as USPS agreed to give non-plaintiffs "equal treatment." He further alleges that both USPS' willingness to negotiate and the presentation of the Concepts Paper constitute an "acceptance" of the "offer." The "consideration" of this "contract," according to Ratner, was FB&R's willingness to "sit down at the bargaining table." Ratner has also termed the "offer" contained in Feder's letters to Babcock as containing a "condition precedent" to negotiation which was "accepted" by USPS.

Reality belies Ratner's reconstruction of the *Smith/Kaplan* negotiations. Feder's letters insist that USPS be "prepared to discuss" the enumerated matters—not that USPS be prepared to concede the issues. Moreover, as Feder testified and FB&R all knew, USPS was unwilling to make commitments regarding the non-plaintiffs with plaintiffs' counsel. Feder's letters were sent with two purposes in mind—to solicit Babcock's help in resolving the litigation and to carefully construct a framework for negotiations. The "offer" or "condition precedent" "accepted" by the Postal Service was merely a proposal initiating negotiations so long as USPS was willing to address the enumerated issues.

All other plaintiffs contend that the "offer" was contained in Feder's March 27 letter to Trosch and that this "offer" was "accepted" by USPS. That letter, attached to the Three Page Proposal, stated in pertinent part:

> On behalf of counsel for plaintiffs in [*Smith/Kaplan*] I submit to you the enclosed proposals for the disposition of these cases.

> These proposals are predicated on our understanding [that USPS would (1) not assert the statute of limitations as a bar to the claim of any non-plaintiff and (2) apply the summary judgments issued by Judge Green to non-plaintiffs].

There are numerous flaws in plaintiffs' analysis.

First, the letter indicated that the "enclosed proposals" were predicated on this understanding. As Feder testified, he was

only referring to the Three Page Proposal, not the Three Funds Proposal. The Three Page Proposal was, as USPS witnesses testified, "not much of an offer," however. It was not the "sign of good faith" Trosch expected from Feder. Rather, as Feder stated at trial, that sign came in the form of the Three Funds Proposal, submitted to USPS shortly after the Three Page Proposal. Once the Three Funds Proposal was tendered, the Three Page Proposal, and therefore the attached letter, was, as expected by Feder and Bernstein, discarded by USPS. It therefore did not constitute an "offer" to the Postal Service, or, alternatively, was revoked by the presentation of the Three Funds Proposal.

Second, Feder's letter omitted a concession crucial to USPS, *viz.*, that FB&R agree that non-plaintiffs would be compensated as the result of a DOL lawsuit, and not as the result of a *Smith/Kaplan* settlement. FB&R knew that neither USPS nor DOJ would relinquish their demand that non-plaintiffs be compensated only as part of a settlement in a DOL lawsuit. They understood that the non-plaintiffs could not be bound by a settlement in *Smith/Kaplan*, and that only a DOL lawsuit would protect USPS from subsequent FLSA litigation. They also knew USPS would not pay attorneys' fees for any recovery secured for non-plaintiffs. Nevertheless, plaintiffs' counsel declined to make this concession. The Court accepts as credible Feder's testimony that he did not fully quote the Concepts Paper (and thus acquiesce to USPS' demand) because he "was still constitutionally incapable of fully accepting the notion that [he would have to] forego a role in the distribution of [payment to non-plaintiffs]." Nevertheless, as Feder testified, he knew that he had to "remove the fee question from the discussion as it related to non-plaintiffs." The letter attached to the Three Page Proposal did not "remove the question"; that was effectuated by the submission of the Three Funds Proposal. The March 27 letter to Trosch was not an "offer."

■ Third, assuming *arguendo* it was an offer, there was no "acceptance." Plaintiffs contend that USPS' "acceptance" may either be implied-in-fact from the USPS' conduct or construed under the "acceptance by silence" doctrine of Restatement, Second, Contracts § 72 (Tent. Draft No. 1, 1974). Both theories, however, require the existence of "mutual agreement." *Kirk v. U.S.*, 451 F.2d at 695. To prove such an agreement, "there must be either circumstances or conduct from which it can be inferred that there was a meeting of the minds." *Id.* No meeting of the minds can be based on the March 27 letter; neither Benson nor Bolger read it. Nor could Plaintiffs have reasonably assumed that Benson or Bolger had read the letter; it was quickly preempted by the Three Funds Proposal.

Finally, all plaintiffs contend that the totality of the circumstances evidences a meeting of the mind regarding coverage of the non-plaintiffs. This contention is premised upon (1) the extensive efforts of FB&R to represent non-plaintiffs, (2) their persistent prodding of DOL and DOJ to insure relief for all employees, (3) USPS' presentation of the Concepts Paper, (4) USPS' understanding that plaintiffs' counsel were reluctant to settle the litigation only for plaintiffs, (5) DOJ and DOL positions regarding equal treatment, and (6) USPS failure to inform FB&R that they did not intend to give equal treatment to the non-plaintiffs. Again, plaintiffs rely on Restatement, Second, Contracts § 72, in support of their position, which states, in pertinent part:

(1) Where an offeree fails to reply to an offer, his silence and inaction operate as an acceptance in the following cases....

(c) Where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept.

The most glaring defect in plaintiffs' analysis is the lack of an offer. None of the "extensive efforts" of FB&R, including the filing of Rule 23 class action and Mandamus claims, can possibly be construed as

an offer. USPS' presentation of the Concepts Paper cannot operate as the relevant offer because it was flatly rejected by Bernstein on March 24. The only offer relevant to the *Smith/Kaplan* agreement was the Three Funds Proposal—which made no mention of non-plaintiffs. Without an operable offer, USPS had nothing to "accept by silence." Its silence, therefore, was reasonable within the meaning of Section 72.

### III. Promissory Estoppel

■ · Plaintiffs next submit that, assuming no contract exists, the alleged non-plaintiff agreement is enforceable under the doctrine of promissory estoppel. Promissory estoppel requires the enforcement of a promise if (1) the promisor expected or should reasonably have expected the promise to induce action of a definite and substantial character by the promisee, (2) which in fact induced such action, and (3) in circumstances requiring the enforcement of the promise to avoid injustice. *Oates v. Teamsters Affiliates Pension Plan*, 482 F.Supp. 481, 488 (D.D.C.1979).

■ Plaintiffs contend that the "promise" upon which FB&R relied is contained in paragraphs 1, 2, and 10 of the Concepts Paper. It is clear that the Concepts Paper must be scrutinized in light of the ongoing negotiations and the political nature of those negotiations. Thus considered, the Concepts Paper was designed to, and did, communicate a message to Feder. USPS was stating, in effect, that if all the FLSA cases can be settled, at a reasonable cost, with the approval of DOL and DOJ, the non-plaintiffs will be compensated on the same basis as plaintiffs are compensated in a *Smith/Kaplan* settlement, in the form of a consent decree in a future *DOL v. USPS* lawsuit. The Court finds that, in light of the negotiations process and the experiences of the negotiators, the Concepts Paper encapsulated a "promise," meeting the "formality" requirements of *Granfield v. Catholic University*, 530 F.2d 1035, 1041 (D.C.Cir.1976).

It is evident, however, that USPS did not expect and could not have reasonably expected the promise to induce "action of a definite and substantial character." Rather, the Postal Service reasonably expected the Concepts Paper to produce a counter-offer. The form and scope of the counter-offer could not possibly have been anticipated by USPS; thus no "action of a definite . . . character" was expected or could reasonably have been expected by USPS, within the meaning of *Oates. See also* Restatement, Contracts, § 90.

Moreover, in view of the express contingencies contained in the Concepts Paper, and the fact that FB&R are all experienced and highly competent attorneys, USPS could not reasonably have anticipated action of a definite nature, based upon selected parts of the proposal *in vacuo*. Rather, in light of Bernstein's response to the presentation of the Concepts Paper, USPS could only have expected, and in fact only expected the presentation of a counter-offer.

FB&R could have, had they desired, drafted their counter-proposal within the framework of the Concepts Paper. Their failure to do this was not the result of USPS' "promise," nor was it predicated upon USPS' intransigence. Rather, it was the product of two understandings, to wit: (1) USPS and DOJ (then counsel to USPS) would not consider awarding them attorneys' fees for damages recovered by the non-plaintiffs, and (2) DOL and DOJ would insure that the non-plaintiffs received equal treatment. FB&R did not suddenly "abandon" the non-plaintiffs, as USPS apparently alleges. Rather, they assumed, on the basis of a variety of indicators, including Clauss' letter to Letter, knowledge of Babcock's position, and the presentation of the Concepts Paper, that they no longer needed to vigorously press the issue of equal treatment. Contrary to plaintiffs' assertion, however, FB&R's assumption was not founded on a promise made by USPS.

Finally, assuming *arguendo* that the expectation of the counter-offer is expectation of an "action of a definite and substantial character," and further assuming *arguendo* that FB&R did not draft their counter-pro-

posal within the framework of the Concepts Paper solely because of USPS' "promise," the promise is only enforceable in "circumstances requiring the enforcement of the promise to avoid injustice." *Id.* Those circumstances simply do not present themselves in the instant litigation.

It is clear that this Court has an "equitable obligation not to give effect to [FB&R's alleged] reliance unless [giving effect] is necessary to avoid injustice." *Granfield v. Catholic University*, 530 F.2d at 1041. To satisfy the final promissory estoppel requirement, four criteria must be evaluated, to wit: (1) the reasonableness of the promisee's reliance, (2) the performance of definite and substantial acts, (3) the form of the promise, and (4) unjust enrichment. *Oates v. Teamsters Affiliates Pension Plan*, 482 F.Supp. at 489. This Court has already held that the form of the promise, in the context of "the contemporary labor environment," *id.*, does not bar application of the doctrine of promissory estoppel. And presentation of the Three Funds Proposal was certainly a definite and substantial act, albeit not reasonably expected by USPS. It is the other two factors that militate against the application of promissory estoppel.

FB&R were in a position to get an agreement concerning non-plaintiffs in writing. This would have required them to draft their counter-proposal within the framework of the Concepts Paper. While their failure to do so may have been reasonable in light of the totality of circumstances surrounding the *Smith/Kaplan* litigation, it would not have been reasonable if based solely on the "promise" made by USPS. USPS' refusal to deal with FB&R concerning non-plaintiffs was unequivocal until the presentation of the Concepts Paper. That proposal was, as Feder testified, a significant deviation from USPS' position. As FB&R knew from paragraph 12, the Concepts Paper as presented could not bind the Postal Service. Reliance on it and the subsequent oral representations, in light of USPS' past positions, would not be reasonable, especially considering FB&R's competence and experience.

This Court, however, does not find that FB&R acted unreasonably. Rather, it finds that FB&R relied primarily on the position of DOL and DOJ[50] when they failed to draft a counter-proposal within the framework of the Concepts Paper. Equitable considerations do not permit this Court to hold USPS liable for FB&R's reliance on the other government agencies.

Moreover, no unjust enrichment will result from this Court's refusal to enforce the alleged non-plaintiff agreement. The non-plaintiffs are currently represented by the Department of Labor, and will suffer no losses as a result of this Court's ruling. Postmaster General Bolger has already testified unequivocally that USPS will waive the Statute of Limitations to May 1, 1974, the date the FLSA became applicable to the Postal Service. The statutory remedies, including liquidated damages, are available and will be utilized by this Court to insure that the non-plaintiffs receive fair and consistent treatment, and USPS will not benefit financially from the delay.

Finally, the issue of compensation for non-plaintiffs is anathema to the structural underpinnings of the FLSA. The Act states, *inter alia*, that in suits not brought by DOL, "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b). This section precludes compensation in a private FLSA action in which an individual is not a consenting plaintiff. The Court is cognizant of the "dual hats" worn by FB&R as counsel both for the named plaintiffs and as attorneys for the employees' labor unions. Nevertheless, FB&R were ultimately responsible only for the named plaintiffs; not for the non-plaintiffs. Equitable considerations do not permit this Court to enforce an alleged non-

---

**50.** While DOJ ostensibly represented USPS, FB&R did not rely on this relationship. Rather, they understood that DOJ and USPS took different approaches to this litigation, that USPS was authorized by Congress to represent itself, and that USPS was in fact representing itself.

plaintiff agreement when enforcement would defeat the specific intent of the FLSA.

### IV. Equitable Estoppel

 Finally, plaintiffs contend that the doctrine of equitable estoppel requires enforcement of the alleged non-plaintiff agreement. This assertion is meritless. The elements of equitable estoppel, "false representation, a purpose to invite action by the party to whom the representation was made, ignorance of the true facts by that party, and reliance," *Hoeber v. D.C. Redevelopment Land Agency*, 483 F.Supp. 1356, 1365 (D.D.C.1980), are wholly lacking here. USPS made no false representations, and FB&R were not ignorant of the true facts surrounding the *Smith/Kaplan* settlement. Thus, equitable estoppel cannot be utilized to enforce the alleged non-plaintiff agreement.

Assuming *arguendo* that the above stated requirements were met, application of the doctrine is still precluded in the instant case. It is well settled that equitable relief will not be granted where an adequate remedy exists at law. *Adamszewski v. Local Lodge 1487, International Ass'n of Machinists and Aerospace Workers*, 496 F.2d 777, 786 (7th Cir. 1974), *cert. denied* 419 U.S. 997, 95 S.Ct. 311, 42 L.Ed.2d 271 (1975); *Smaldone v. Kurtz*, 450 F.Supp. 1138, 1140 (D.D.C.1978). Here, an adequate remedy at law exists, and is embodied in the FLSA. Plaintiffs' equitable estoppel claim does not lie.

### V. Conclusion

Plaintiffs have failed to prove the existence of the alleged non-plaintiff agreement.