**Jeffrey D. ROBINSON, et al., Plaintiffs,**

v.

**Michael NUSSBAUM, Defendant.**

**No. CIV.A. 96–2243(HHG).**

United States District Court,
District of Columbia.

Dec. 23, 1997.

---

John Payton, Michael W. Carroll, Steven P. Finizio, Wilmer, Cutler & Pickering, Washington, DC, for Plaintiffs.

Jacob A. Stein, Stein, Mitchell & Mezines, Washington, DC, Bernard J. Nussbaum, Sonnenschein Nath & Rosenthal, Chicago, IL, for Defendant.

### *OPINION*

HAROLD H. GREENE, District Judge.

This action arises out of the dissolution of a law partnership. Plaintiffs Jeffrey D. Robinson, Eric L. Lewis, Michael B. Waitzkin, Martin R. Baach, and James P. Davenport and defendant Michael Nussbaum were each partners in the Washington, D.C. law firm of Nussbaum & Wald. In their Amended Complaint, plaintiffs seek declaratory relief as well as monetary damages for fraud, misrepresentation, breach of contract, wrongful dissolution, and breach of fiduciary duty. The defendant, Mr. Nussbaum, filed a three-count counterclaim for declaratory relief and an accounting of his entitlements in the winding up of the partnership.

The Court ordered separate trials for the jury and non-jury claims. It is to be noted, however, that in an Opinion issued before trial, the Court entered partial summary judgment in favor of defendant Nussbaum. The Court ruled that under the District of Columbia Uniform Partnership Act, D.C.Code §§ 41–101 *et seq.* and the District of Columbia Court of Appeals' opinion in *Beckman v. Farmer*, 579 A.2d 618 (D.C. 1990), Nussbaum is entitled to share in hourly fees earned by his former partners which stem from client matters that were pending but uncompleted at Nussbaum & Wald at the time of dissolution.

In the current phase of the litigation, the Court tried Counts One and Three of plaintiffs' Amended Complaint without a jury from August 4, 1997 through August 8, 1997. In Count One, plaintiffs request a declaration that Jeffrey D. Robinson was an equity partner in Nussbaum & Wald from not later than January 1, 1995. This issue was resolved by stipulation during trial.[1] In Count Three, plaintiffs seek a declaration that Nussbaum & Wald did not have a partnership agreement, written or oral, with respect to the partners' shares in the profits, assets and liabilities of the firm for 1995 and 1996.[2]

This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### I

Nussbaum & Wald was formed as a partnership in October of 1989. The firm was very successful. While it briefly operated with a net loss after its inception, Nussbaum & Wald went on to earn substantial profits over the next six years.

It is undisputed that the partnership was never governed by a comprehensive written partnership agreement. As a result, the firm had to establish a procedure for dividing the profits and income of the partnership more or less on an ad hoc basis. Plaintiffs presented evidence that the process for deter-

---

1. The defendant agreed to stipulate to ¶ 34 of the plaintiff's amended complaint. Paragraph 34 reads:
   Plaintiffs seek a declaration that Plaintiff Robinson was an equity partner in Nussbaum & Wald from no later than January 1, 1995.

*See* Tr. Aug. 5, 1997 at 80.

2. This opinion addresses all pending non-jury issues.

mining partnership profit- and loss-sharing percentages changed each year. In general, however, because the partners had not agreed in advance on a formula for dividing profits, the partners would agree on percentage shares retrospectively. That is, they would decide how to divide the previous year's income at some point during the next calender year.

The first shares agreement was reached during April of 1991. On April 1, 4 and 5, the partners met and agreed upon the division of partnership income for 1990 only. *See* Ex. 48. The partners agreed to unequal shares in income for the several partners.[3] The minutes of these meetings reflected that the partners attempted to reach agreement with respect to percentage shares for 1991, 1992 and 1993, but that no final agreement was reached. *See id.* Instead it was proposed that Michael Nussbaum serve as a "committee of one," speaking to each partner individually about the fixing of shares. *See id.* The partners did not settle on a future means for dividing partnership income.

These meetings (dubbed the "Vista meetings" because they took place in part at the Vista hotel) were characterized by each former partner as unpleasant and contentious. Mr. Waitzkin testified that the meetings were "ugly," damaging individual relationships to the point that they never really recovered. Following the meetings, James Davenport announced his intention to withdraw from the firm. *See* Ex. 49. Although he was persuaded to remain with Nussbaum & Wald, the partners never again met in person to determine percentage income shares. Rather, when it was necessary to determine shares, Nussbaum would present a proposed distribution of shares to Baach, and he would then go back and forth, negotiating with all of the other partners, until a consensus was achieved.

In October of 1992, the partners reached agreement as to income shares for 1991. Michael Waitzkin testified, however, that these shares were agreed to only because the firm's partnership tax return for 1991 had to be filed by October 15, 1992. The partners decided on these percentages, not in a partnership meeting, but through memoranda and fax. Mr. Waitzkin testified that the partners did not hold a meeting in part to avoid reliving the previous year's unpleasantness at the Vista meetings. The income shares for 1991 were again unequal.[4]

The following year the same tax deadline approached and again the partners had not agreed as to percentage shares. In October of 1993, only one day before the partnership tax returns were to be filed, the partners agreed that the income percentage shares for 1992 would be the same percentages used throughout that year to make monthly cash distributions. Exhibit 93. Mr. Waitzkin testified that it was clear to all the partners that the process of determining profit shares at the eleventh hour was causing serious problems at the firm. To avoid the last-minute fixing of income shares, in April of 1994 the partners reached an agreement for partnership percentages applicable to income from 1993 *and* 1994.[5] Mr. Waitzkin testified that, again, the partners did not hold a meeting. Michael Nussbaum proposed initial figures and the remaining equity partners circulated memoranda with comments and changes.

## II

Because there was no comprehensive written partnership agreement throughout the tenure of Nussbaum & Wald, the partners were advanced money by the firm to meet their living expenses and quarterly tax payments. These advances were referred to as "cash draws" and "tax draws" respectively. There was a distinction between "draws" and

---

**3.** The percentage shares for 1990 were as follows: Michael Nussbaum 33%, Martin Baach 20%, James Davenport 18%, Michael Waitzkin 17.5% and Eric Lewis 11.5%. Exhibits 44, 48.

**4.** The percentage shares for 1991 were as follows: Michael Nussbaum 36%, Martin Baach 18.2%, James Davenport 16.3%, Michael Waitzkin 15.9% and Eric Lewis 13.6%. Exhibit 77.

**5.** The percentage shares for 1993 and 1994 were again unequal: Michael Nussbaum 36.8%, Martin Baach 19.4%, James Davenport 15.1%, Eric Lewis 14.1% and Michael Waitzkin 14.6%. Exhibit 103.

"income:" draws being money advanced against future profits. The draws did not necessarily represent final compensation. As a matter of accounting, all draws were debited against (i.e. deducted from) an individual partner's capital account. When the partners agreed on income shares for a given year, which with the exception of the 1994 shares was done after the end of the year, the resulting income was credited (added) to each partner's capital account.

The monthly cash draws did not track share percentages. Cash draws were for a fixed amount which was established early in the firm's existence. The tax draws, however, typically tracked prior share percentages. Again, because of the absence of a formal partnership agreement, the partners adopted the convention of using the previous year's share agreement to compute tax draws.

The firm's administrator, Sharon Harris, distributed the tax draw checks with a cover memorandum. On April 14, 1992 the memorandum included the following language: "Marty Baach has asked me to be certain that this memorandum stated that these distributions are *without prejudice* and are understood to be subject to the partners' agreement on 1992 percentages." Exhibit 72 (emphasis added). This memorandum was the first of a series of tax draw memoranda that accompanied the partners' tax draw checks. *See also* Ex. 74, 86, 90, 101, 104, 113, 150, 168, 177, 187, 204, 206, 217, TTTT. In April of 1993, Sharon Harris circulated a similar memorandum announcing that draw checks would be distributed based on the percentages that were determined for 1991. *See* Ex. 86. This memorandum reiterated the "without prejudice" language because the partners had not yet agreed to the distribution for 1992 or 1993. Because the partners did not agree to shares for 1993 and 1994 until April 1994, the tax draw memoranda for the first quarter of 1994 noted that the draws were "understood to be without prejudice." Ex. 101. The tax draw memorandum

for the remainder of 1994, however, did not include the "without prejudice" language because share percentages were established as of that April. All subsequent tax draw memos contained the "without prejudice" qualification, with the December 1995 and January 1996 memos containing slightly different language: "without prejudice to readjustment." Ex. 202.[6]

### III

In September 1994, Robinson returned to the firm after working for the D.C. and federal governments. Robinson agreed to a fixed salary for 1994 because the partners had already agreed on shares for 1994. Robinson became an equity partner as of January 1, 1995. Prior to April 1996, Robinson received monthly draws but he did not receive tax draws because he said he did not need them when he first returned to the firm from government service. When Robinson requested a tax draw in April 1996, Nussbaum directed Harris to prepare a memorandum instructing that Robinson be paid an additional $47,000 at 1995 income. The April 1996 tax draw calculation based on Robinson's total draws for 1995 put Robinson's percentage of 1995 profits at 7.5%. The other partners' percentages were then recalculated to account for Robinson's tax draw percentage.[7] Harris used the resulting percentages for the remaining tax draws.

Robinson testified that he understood that the partners eventually would agree on his share percentage and never took the 7.5% calculation as a final determination of his share. With the exception of Nussbaum, the other partners each testified that they never discussed or agreed to shares in April 1996 and did not agree that Robinson's share would be 7.5%.

In mid–1994, just prior to Robinson's return to the firm, the partners attempted to complete a comprehensive partnership agreement. In July 1994 Nussbaum contacted Robert Kapp to represent all the partners in

---

**6.** This language was changed at the request of Nussbaum. The customary "without prejudice" language returned in the June and September 1996 memos.

**7.** The recalculated percentages were as follows: Michael Nussbaum 34%, Martin Baach 18%, James Davenport 14%, Eric Lewis 13%, Michael Waitzkin 13.5%, and Jeffrey Robinson 7.5%. Ex. 214 at 2.

the formation of a partnership agreement. Through interviews with Nussbaum and the other partners Kapp learned that, true to form, the partners had yet to agree on shares for 1995. Kapp testified that during the course of his dealings with the partners, it became clear that the partners were aware of the Partnership Act consequences of having no comprehensive partnership agreement.

In October 1994, while work with Kapp on a partnership agreement was ongoing, Nussbaum hired counsel, Henry Zapruder, to represent him in his pursuit of a retirement plan (which represents one of his principal interests). In January 1995 Nussbaum and Zapruder developed a retirement plan applicable only to Nussbaum that was to be funded by Nussbaum & Wald. Nussbaum presented his retirement plan proposal only to Baach, and he convinced Baach that they should work out the plan in confidence and then present it to the other partners. Nussbaum's proposal called for inflation-adjusted payments to Nussbaum totaling more than $5 million.[8] The plan also called for a guarantee of the plan by the other partners.[9]

In March 1996 Baach informed Nussbaum that he could not support the proposal because it was too costly for the firm. Upon hearing this rejection, Nussbaum became "furious with [Baach]—very very angry" and told Baach that "he would have to consider all his options." Tr. Aug. 7, 1997 at 65.

Following Nussbaum's strong reaction, Baach became concerned that he was jeopardizing the firm by negotiating the retirement proposal without involving the other partners. Baach then informed the other partners about Nussbaum's proposal and about his negotiations with Nussbaum and Zapruder. Baach designed these meetings, termed "secret meetings" by Nussbaum, "to get the firm moving in the right direction again." Tr. Aug. 7 at 91.

In April 1995, following his meetings with the other partners, Baach phoned Zapruder with a counterproposal in order to get things back on track; a proposal Zapruder characterized as "constructive." Zapruder drafted a response to Baach's counterproposal and sent it to Nussbaum but never heard back from Nussbaum. Neither this nor any other response to the counterproposal was ever sent to Baach.

Around the same time that Nussbaum created his retirement proposal, Kapp completed and circulated a written draft partnership agreement. The draft covered and resolved all major issues between the partners except Nussbaum's retirement provision, including a provision to replace the equal shares provision of the UPA by providing that shares from the preceding year carry forward until a further agreement was reached. Efforts to adopt the proposal stalled, however, because there was no agreement on Nussbaum's retirement proposal which was linked to unresolved issues on profit percentages. Nussbaum informed Baach that he would not agree to any matters having a financial impact on the firm until his retirement proposal was accepted. Kapp urged Nussbaum to resolve the retirement issue but to no avail. The draft partnership agreement was never adopted.

## IV

In the summer of 1996 Baach sought a meeting with Nussbaum to resolve outstanding partnership issues. In response to Nussbaum's demand that he receive a written agenda for the meeting, Baach provided a handwritten agenda that included Nussbaum's retirement plan, firm governance, and the creation of a "continuing compensation scheme ... which is not determined by one person" as issues to be addressed. The meeting went forward with inconclusive results.

Resulting from his frustration with the inability of the partners to firm up a partnership agreement, Davenport drafted and de-

---

8. The plan called for ten annual payments beginning at approximately $356,000 and increasing to about $485,000 plus a payout of accounts receivable estimated at $1.2 million over the first three years of his retirement. *See* Ex. 173.

9. After reviewing the plan the firm's accountant, Ned Scherer, questioned the impact Nussbaum's proposal would have on the firm's ability to survive. *See* Ex. 196.

livered to Nussbaum's home a "harsh" memo which communicated his frustration and requested a partnership meeting for September 5, 1996.[10] Nussbaum responded by memorandum to all the partners wherein he claimed he was in "full agreement" with Davenport's "observation ... that the firm faces serious issues that need fundamental restructuring and that timing is critical." Ex. 224. He also requested that the meeting be rescheduled for September 9, 1996.

The partners convened on September 9 but before any discussion of the pending partnership issues, Nussbaum served a Notice of Dissolution on his partners. *See* Ex. 230.

## V

In the absence of an agreement among partners, the Uniform Partnership Act ("UPA") governs the rights and duties of partners. *See* D.C.Code § 41–117 (1990 Repl.). The UPA provides in pertinent part that "[t]he rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them, by the following rules: (1) Each partner shall ... share equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied ...." *Id.* Thus, the critical question in this case is whether there was any agreement between the partners of Nussbaum & Wald as to the partners' shares in 1995 and 1996 income and in any surpluses upon dissolution. If there was an agreement, the shares and surplus were to be divided in accordance with the agreement. If no agreement existed, the division was to be in equal shares in accordance with the UPA.

■ There is no evidence of an express agreement among the equity partners of Nussbaum & Wald, and if any contract existed at all on the dissolution of the firm, it must be implied from the facts and circumstances of the case and the conduct of the parties. *See Grunseth v. Marriott Corp.*, 872 F.Supp. 1069, 1073 (D.D.C.1995) (citing *Equity Group, Ltd. v. Painewebber Inc.*, 839 F.Supp. 930, 933 (D.D.C.1993)) (citing *Richardson v. J.C. Flood Co.*, 190 A.2d 259, 261 (D.C.1963)). Express and implied contracts have essentially the same elements, the difference between them merely being how each is proved. *See Donovan v. United States Postal Service*, 530 F.Supp. 872, 890 (D.D.C.1981). While an express contract is proved through testimony regarding offer and acceptance, an implied contract is "inferred from the acts of the parties and other circumstances showing an intent to contract." *Id.*

As the partner alleging that an agreement existed between the partners as to the allocation of shares in 1995 and 1996, Nussbaum carries the burden of proving that such an agreement existed. *See Conrad v. Judson*, 465 S.W.2d 819, 824 (Tex.App.1971); *see also Grunseth v. Marriott Corp.*, 872 F.Supp. 1069, 1073 (D.D.C.1995) (stating that party alleging the existence of an implied contract bears the burden of establishing each of the essential elements of breach of an implied contract). For the Court to find that an agreement existed, the defendant must prove by a preponderance of the evidence that there was mutual assent. *See Osborn v. Boeing Airplane Co.*, 309 F.2d 99, 102 (9th Cir.1962). Of paramount importance are the intentions of the partners; they govern their relationship, *see Singer v. Scher*, 761 F.Supp. 145, 146 (D.D.C.1991), and a contract will not be implied contrary to those intentions. *See Lewis v. Hill*, 409 S.W.2d 946, 949 (Tex.Civ. App.1966).

Applying the foregoing to the facts found by the Court, the facts support no conclusion other than that there was no agreement,

---

10. In this memo, Davenport noted that the partners had gone "seven years without a written partnership agreement, with profit shares decided only year-by-year, typically at the eleventh hour and expressly avoiding any decision ("without prejudice") as to how future shares will be set. No shares have been agreed for 1995 and 1996 ...." Ex. 222. The memo further provided that unless the partners agreed on "all matters by September 18 ... we will have to declare ourselves at impasse and proceed to dissolution." *Id.* Other partners attempted to convince Davenport to tone down his memo so that Nussbaum would be encouraged to work with the other partners to complete a partnership agreement. Indeed, Nussbaum received the memo as "demeaning" and "insulting."

implicit or otherwise, between the partners of Nussbaum & Wald as to shares of 1995 and 1996 profits.

## VI

■ The agreement reached in April of 1994, limited to the income received in 1993 and 1994, was the last shares agreement reached by the equity partners. The defendant argued throughout the trial that the partners had an implicit understanding, based on the course of their conduct, that any agreed-upon percentages were to remain in place during the following years unless and until they were changed by another agreement. However, the defendant did not produce any persuasive evidence that such an understanding existed between the partners. Indeed, the defendant conceded at trial that at the 1991 Vista meetings the other partners explicitly rejected his proposal to carry-forward, or apply, the previous year's share agreement to the 1991, 1992, and 1993 profits absent an agreement to the contrary.

With regard to the profits for 1995 and 1996, the defendant claimed that an understanding between the partners was manifested in the way in which they received cash distributions and tax draws. Although the partners' tax draws were based on the previous year's percentages, it is clear that from as early as April of 1992 the partners understood that these tax draws were not binding as to profit shares for the following year. Each partner, except Mr. Nussbaum, testified that this was his understanding.

Critical to the Court's conclusion that there was no agreement among the partners regarding shares for 1995 and 1996 is the language found in almost every tax draw memo that distributions were "without prejudice." With the exception of Nussbaum, all of the partners understood this language to mean the following: that because there was no standing agreement as to shares and because tax draw checks had to be cut, the previous year's percentages were used to calculate the amount of these checks, but the amounts distributed in the tax draws were not binding and had no significance other than for the calculation of tax draws. Nussbaum contends that the alteration of the "without prejudice" language in the December 1995 tax draw memorandum to "without prejudice to readjustment" and the removal of the words "[a]s there is no agreement on '95 shares" signals the existence of agreement on 1995 shares. This argument is not persuasive; the single non-conclusive deviation from the previous language cannot be read to effect a wholesale change in the partnership arrangement.

Baach testified that he agreed to the altered language because he perceived no difference between the meaning of the words "without prejudice" and "without prejudice to readjustment." The defendant's contention that the addition of the words "to readjustment" talismanically changed the meaning of "without prejudice" to "with prejudice" is wholly unsupported. If anything, "without prejudice to readjustment" clarified the understanding of the parties. The defendant adding these two words without any consultation or discussion with the other partners could not and did not alter the partners' existing intentions and understandings. Finally, the Court notes that the meaning Nussbaum assigns to these words—that the partners only reserved the right to readjust the shares in the future if they unanimously agreed—is utterly superfluous because contracting parties always have the ability to modify a prior agreement by mutual assent.

At trial, each plaintiff testified that agreements as to percentage shares were limited in scope and duration. Each asserted that share agreements applied only for the previous year (with the exception of the last agreement which covered 1993 and 1994) and that they were not meant to continue into the following years. Significantly, although the firm's partners were careful to memorialize details of the firm's operation in memoranda, the defendant cannot point to a single memorandum that proves or even supports his contention that an implicit agreement existed between the partners as to 1995 and 1996 shares.

In sum, the evidence overwhelmingly supports the conclusion that the partners agreed that the acceptance of tax draws would not "prejudice" or predetermine their eventual

agreement on income shares and that there was no implicit agreement to the contrary.

## VII

The Court notes that the defendant's stipulation that Robinson was an equity partner by January 1, 1995 further belies the defendant's argument that there was any agreement to apply the 1994 shares to 1995 and 1996. If there was any agreement between the partners as to income shares for 1995 and 1996, that agreement necessarily would have had to be altered upon the arrival of Robinson as a partner. Accordingly, upon his stipulation to the fact of Robinson's partnership, Nussbaum was forced to switch gears and to contend that in April 1996 Robinson agreed to a new set of shares that all the other partners later agreed to as well. The evidence, however, contradicts the defendant's assertion that the partners ever agreed to any shares for Robinson, much less 1995 and 1996 shares for themselves.

The defendant testified that all the partners were aware that in April 1996 Robinson was paid $47,000 at Nussbaum's direction as an April 1996 tax draw. The other partners testified, however, that they were unaware of this payment. Because Robinson had received a tax draw, Sharon Harris prepared a tax draw worksheet that showed recalculated percentages for each partner. Nussbaum claimed that the tax worksheet showing Robinson's total 1995 draw as 7.5% of the profits constituted a new agreement among the partners for 1995 shares. The weight of the evidence, as well as common sense, counsel otherwise.

If anything, the tax worksheet was just that, a worksheet used to recalculate the partners' percentages to reflect the fact that Robinson needed money to pay his quarterly taxes. The 7.5% figure reflected, as a percentage of the 1995 profits, the $47,000 Nussbaum directed Harris to pay Robinson, added to the money he had already received in 1995. Harris merely converted Robinson's total 1995 income into a percentage of the 1995 profits so that she could calculate an April 1996 tax draw.

The testimony during trial indicated that this worksheet was never shown to any partner but Baach in his capacity as managing partner. Accordingly, the worksheet in no way could create an agreement between the partners as to 1995 shares. The testimony of the partners and Ms. Harris showed that no partner except Robinson had any dealings with Nussbaum, written or otherwise, regarding draws or shares in April 1996. Indeed, the testimony underscored the fact that tensions regarding Nussbaum's retirement proposal were running high in April 1996. In light of this tension, it is implausible that the partners would agree carry-forward Nussbaum's 1994 share, recalculated and pro-rated to account for Robinson's tax draw, to 1995 and 1996.

Finally, as noted above, if the partners had in fact agreed in April 1996 to shares for 1995 and 1996 the firm would have followed the customary procedure of circulating a memorandum to each partner that confirmed the income shares, informed the accountants of the percentages and directed that the accountants prepare a 1995 partnership tax return based on these percentages. Not one of the above events occurred and this can only be because there was no agreement as to shares.

## VIII

### *Conclusion*

The truism that partnerships should have written partnership agreements is underscored by the consequences the Uniform Partnership Act imposes upon partnerships that do not: in the absence of an agreement to the contrary, all partners share equally in the revenue of the firm. Such a harsh consequence may easily be avoided by a partnership agreement. The partners of Nussbaum & Wald attempted on multiple occasions to create an agreement for their firm, but personal differences, animosities and hubris stood in their way.

It is clear from the evidence presented at trial that the partners of Nussbaum & Wald operated for almost seven years without any kind of partnership agreement. As a direct result of the absence of such an agreement, they engaged in a continuing pattern of last-

minute allocation of shares in the profits of the firm. The most prominent example of their systematic eleventh-hour share agreements was the necessary use of a previous share agreement as the basis for quarterly tax draws. Contrary to the defendant's interpretation of those events, they serve no better purpose than to illustrate the lack of any agreement among the partners as to profit shares.

Accordingly, with no persuasive evidence of any agreement as to profit shares for 1995 or 1996, the Uniform Partnership Act's equal shares provision governs the distribution of the firm's profits, assets and liabilities.[11]

An Order consistent with the above is being issued contemporaneously herewith.

### ORDER

In accordance with the Opinion issued contemporaneously herewith, it is this 23rd day of December, 1997

ORDERED that judgment is hereby entered in favor of plaintiffs Jeffrey D. Robinson, Eric L. Lewis, Michael B. Waitzkin, Martin R. Baach, and James P. Davenport on Count Three of the Amended Complaint; and it is further

DECLARED that Nussbaum & Wald did not have an agreement, either written or oral, with respect to the partners' shares in the profits of Nussbaum & Wald for 1995 and 1996; and it is further

DECLARED that pursuant to the District of Columbia Uniform Partnership Act, D.C.Code §§ 41–101 *et seq.*, at the time of dissolution each equity partner was entitled to an equal share in Nussbaum & Wald's net profits, assets and liabilities.

---

**11.** Although this is by no means decisive, it may be noted that the inability of the firm to adopt a partnership agreement is due in no small measure to Mr. Nussbaum's position on his retirement package.