# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

--------

Argued October 21, 2013        Decided April 4, 2014

No. 12-7099

MICHAEL QUEEN,
APPELLANT

v.

ED SCHULTZ,
APPELLEE

--------

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-00871)

--------

*Steven W. Teppler* argued the cause for appellant. With him on the brief was *Frazer Walton, Jr.*

*Jeffrey B. Landa*, pro hac vice, argued the cause for appellee. On the brief was *John C. Hayes, Jr.*

Before: GRIFFITH and SRINIVASAN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

SRINIVASAN, *Circuit Judge*: In January 2008, NBC employee Michael Queen approached then-radio talk show host Ed Schultz to ask whether Schultz would be interested in getting into the television business. What happened next is in dispute. Queen says that he and Schultz verbally agreed

to become partners in a project to develop a television show starring Schultz as host. Schultz denies any such agreement. Schultz later entered into a contract with the cable television network MSNBC to host "The Ed Show" on weekday evenings, and the show has aired on MSNBC in various timeslots since April 2009. Queen now claims an entitlement to a portion of Schultz's income from "The Ed Show" based on their alleged agreement to co-develop a show. Schultz, disclaiming any agreement, believes that Queen is entitled to nothing.

After the relationship between the two men broke down, Queen sued Schultz in district court, and Schultz responded with counterclaims against Queen for fraud, slander, and libel. On cross-motions for summary judgment, the district court ruled that neither Queen nor Schultz was liable to the other for anything. *Queen v. Schultz*, 888 F. Supp. 2d 145, 175 (D.D.C. 2012). Queen (but not Schultz) appealed, arguing that the district court erred in granting summary judgment to Schultz with respect to Queen's breach-of-contract claim and his breach-of-partnership-duties theory. We disagree with Queen on the breach-of-contract claim but agree with him on the partnership theory. We conclude that there exists a genuine issue of material fact as to whether Queen and Schultz formed a partnership to develop a television show and, if so, whether Schultz is liable to Queen for breach of partnership duties. We therefore remand to enable Queen to present his partnership theory to a jury.

## I.

In an appeal from an order granting summary judgment, our review is de novo, and we view the evidence in the light most favorable to the nonmoving party—here, Queen. *United States v. Regenerative Scis., LLC*, 741 F.3d 1314,

1318 (D.C. Cir. 2014). According to Queen's version of events, in 2007, Queen initially conceived the idea of a television show starring Ed Schultz. At the time, Schultz was a radio talk show host based in Fargo, North Dakota, and had also made guest appearances on various television networks. Before Queen and Schultz ever met or spoke, Queen presented the concept for the show to the then-chief of NBC News' Washington bureau, Tim Russert, and began developing a strategy to promote the idea.

In January 2008, Schultz visited NBC's Washington office building, and Queen and Schultz spoke for the first time. While the parties now dispute what was said in their initial conversation, we must credit Queen's version at the summary judgment stage. According to Queen, he asked whether anyone was working with Schultz "to make a TV show happen." Schultz responded: "No. Now you're it." Beginning in February 2008, Queen worked further on the show idea "with Schultz's specific and enthusiastic approval." Queen Decl. ¶ 5, ECF No. 24-3. Queen taped Schultz's guest appearances on various television shows in order to create a demonstration reel, and he enlisted a former NBC News director, Max Schindler, "to partner with Schultz and [Queen] in the development of the project." *Id.* ¶¶ 5-6. Queen, Schindler, and Schultz then engaged in a series of telephone conversations and e-mail exchanges in which they discussed "ownership percentages" in "the agreed upon partnership." Queen says they "agreed that, in addition to salaries, I would receive 25%, Schindler would receive 25%, and Schultz would receive 50% of income realized by the program after expenses, should it be sold." *Id.* ¶ 8.

Queen introduced into the record a series of e-mail communications with Schultz in which the two men sought to hammer out the details of their financial arrangement.

Schultz does not dispute the authenticity of those e-mails. In one e-mail, on March 5, 2008, Schultz said to Queen: "I will agree to a 50-25-25 percentage formula of profits after expenses of the show. Each of us will have a salary for working on the show although that needs to be figured out." In a reply five days later, Queen asked Schultz to "take a look" at the "tentative agreement" that Queen had attached, adding: "Will this work for you? The sooner we can all agree the better." The attachment, entitled "Partnership Agreement," provided Queen, Schindler, and Schultz with equal interests in the partnership (one-third of profits and losses). The draft agreement also indicated that Queen, Schindler, and Schultz each would receive salaries from the partnership, although the salary amounts remained blank.

As negotiations dragged on, Schindler decided to leave the project. Schindler says in an affidavit that he thought Schultz "would not honor any verbal agreements" because Schultz refused to sign a written contract. Schindler Decl. ¶ 3, ECF No. 24-1. Schindler also states that he "warned [Queen] that . . . he should abandon this project with Schultz or he would regret it." *Id.* Queen disregarded Schindler's advice. Instead, Queen brought his "concerns of trust" to Schultz, and on April 5, 2008, Schultz sent an e-mail to Queen apparently intended to assuage those concerns. Schultz wrote:

> I understand your concern about a financial arrangement moving forward. I can't give you specifics at this time. We do not know what we are dealing with at this point and what kind of opportunity may present itself. However, any TV deal will obviously involve you. I will not do a TV deal without your involvement and that includes a

financial involvement. Rest assured, we are together on this. I hope this works for you at this point.

Queen says he continued to pitch the idea of a television show starring Schultz to executives at NBC and MSNBC, but neither network decided to hire Schultz that spring. Queen also continued to correspond with Schultz and Schultz's attorney, Jeffrey Landa, about the terms of a partnership agreement. In an e-mail to Landa on May 29, 2008, Queen set forth his latest set of requests: (i) Queen, Schultz, and Landa would each own a one-third interest in the partnership; (ii) Schultz "would have total control of content, hiring, [and] production decisions"; (iii) Queen "would receive an amount equal to 10% of [Schultz's] television salary for the duration of any TV production formed from this agreement"; and (iv) Queen "would be included in any television enterprise." Landa responded that it was "out of the question" for Queen to possess an ownership interest in the 30% to 40% range. Landa also told Queen that Schultz "is not interested in having your 'salary' based on his 'salary' and he is not interested in having a salary allotted to you without ongoing responsibilities (to be negotiated) on your part."

Even as the parties argued over the terms of the business arrangement, Queen arranged for the availability of an NBC studio in Washington for the production of a pilot episode of the show. The recording of the pilot episode took place on June 26, 2008. Schultz told Queen that he and Landa would pay for production of the pilot, but Queen says that he ended up paying the $11,000 studio rental fee from the proceeds of a personal home equity loan, and also bore other unspecified pilot-related expenses.

According to Queen, he then sent a copy of the pilot to Alan Horlick, the general manager of CBS's Washington

affiliate, WUSA. Queen says that he and Horlick eventually struck a deal under which WUSA would broadcast a show starring Schultz in the 7:30 a.m. to 8:00 a.m. timeslot on Sunday mornings. The deal provided that Queen and Schultz would pay a fixed fee to WUSA and would themselves own the half-hour timeslot on Sunday mornings; if the show proved successful after six months or a year, WUSA would have an opportunity to negotiate an ownership interest in the show. As plans for the WUSA show moved forward, Queen contends that he located and rented an apartment for Schultz and Schultz's wife in Washington, D.C., helped furnish the apartment, and provided Schultz and Schultz's wife with car rides. In March 2009, however, just weeks before Queen and Schultz were to begin production on the WUSA show, Schultz backed out of the project and accepted an offer from MSNBC to host "The Ed Show."

After the launch of "The Ed Show," Queen says he contacted Schultz, Schultz's attorney, and the parent company of MSNBC and asserted an entitlement to compensation under his agreement with Schultz. Schultz sent Queen a $12,000 check as reimbursement for the NBC studio rental fee plus interest, although Queen contends that Schultz has yet to reimburse him for other pilot-related expenses. Schultz denies Queen's entitlement to any further payment.

In May 2011, Queen sued Schultz in the district court, alleging breach of contract, fraud in the inducement, tortious interference with business relationships, and intentional infliction of emotional distress. Queen invoked the district court's diversity jurisdiction, as Queen is a resident of Maryland, Schultz is a resident of Minnesota, and the amount in controversy exceeds the $75,000 jurisdictional threshold. *See* 28 U.S.C. § 1332(a). Schultz responded with

counterclaims against Queen for fraud, slander per se, and libel per se.

In August 2012, the district court granted summary judgment to Schultz on Queen's claims and to Queen on Schultz's counterclaims. *Queen*, 888 F. Supp. 2d at 175. Of particular salience, the court considered (and rejected) Queen's breach-of-contract claim under two distinct frameworks: first, the court examined the claim as an ordinary breach-of-contract action independent of any allegation that Queen and Schultz had formed a partnership, *see id.* at 159-64; and second, the court considered the claim "under a partnership theory," *see id.* at 164-67.

## II.

Queen confines his appeal to his breach-of-contract claim and his breach-of-partnership-duties theory, arguing that the district court should have allowed Queen to present them to a jury. We reverse the grant of summary judgment "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). We may affirm the grant of summary judgment on any ground supported by the record, even if it differs from the theory applied by the district court, "provided that the opposing party has had a fair opportunity to dispute the facts material to that ground." *Washburn v. Lavoie*, 437 F.3d 84, 89 (D.C. Cir. 2006); *see also Wash.-Balt. Newspaper Guild, Local 35 v. Wash. Post*, 959 F.2d 288, 292 n.3 (D.C. Cir. 1992). Queen and Schultz both accept the lower court's conclusion that District of Columbia law governs, and we follow the decisions of the

District of Columbia Court of Appeals with respect to local law. *See Burke v. Air Serv Int'l, Inc.*, 685 F.3d 1102, 1105, 1107 n.4 (D.C. Cir. 2012). Applying District of Columbia law, we conclude that Queen should be permitted to present his breach-of-partnership-duties theory to a jury.

**A.**

We initially consider Queen's ordinary breach-of-contract claim—i.e., without regard to any partnership theory. Under District of Columbia law, a valid and enforceable contract requires "both (1) agreement as to all material terms; and (2) intention of the parties to be bound." *Duk Hea Oh v. Nat'l Capital Revitalization Corp.*, 7 A.3d 997, 1013 (D.C. 2010) (internal quotation marks omitted). Queen, as the party asserting the existence of a contract, bears the burden of proof on both issues. *See Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995). And for purposes of surviving summary judgment, Queen must demonstrate a genuine issue of material fact as to both prongs. Because we conclude that Queen fails to make the requisite showing with regard to an "agreement as to all material terms," we need not consider whether the parties intended to be bound. *See Malone v. Saxony Coop. Apartments, Inc.*, 763 A.2d 725, 729-30 (D.C. 2000).

The "material terms" of a contract generally include "subject matter, price, payment terms, quantity, quality, and duration." *Rosenthal v. Nat'l Produce Co.*, 573 A.2d 365, 370 (D.C. 1990). A contract's material terms must be "'sufficiently definite' so that each party can be 'reasonably certain' about what it is promising to do or how it is to perform." *Dyer v. Bilaal*, 983 A.2d 349, 356 (D.C. 2009) (quoting *Rosenthal*, 573 A.2d at 370). While the terms of the agreement "need not be fixed with complete and perfect

certainty for a contract to be enforceable," the contract terms "must be clear enough for the court to determine whether a breach has occurred and to identify an appropriate remedy." *EastBanc, Inc. v. Georgetown Park Assocs. II, L.P.*, 940 A.2d 996, 1002 (D.C. 2008) (alterations and internal quotation marks omitted).

The district court determined that Queen and Schultz "never agreed with reasonable certainty on several material terms of the alleged agreement, most notably the amount of compensation that would be paid to the plaintiff." *Queen*, 888 F. Supp. 2d at 160. Compensation constitutes a "material term" of the contract, and Queen does not contend otherwise. Instead, Queen argues that he, Schindler, and Schultz agreed that he and Schindler would each receive 25% of the show's profits and Schultz would receive 50%. The district court rejected that argument, concluding that "the 50/25/25 figure was never finalized as a term of any agreement and was in fact superseded by other proposals and counter-proposals regarding compensation structures." *Id.* at 161.

As the district court observed, none of the e-mails in the record demonstrate finalization of the 50/25/25 allocation. But that alone would not necessarily defeat Queen's breach-of-contract claim because he argues that the parties *verbally* agreed to a 50/25/25 split in March 2008. That Queen and Schultz subsequently discussed other compensation structures likewise would not necessarily disprove Queen's claim that the parties had initially reached agreement on a 50/25/25 split. If the parties had in fact agreed to a 50/25/25 formula, Queen's later proposals for a one-third/one-third/one-third split would not invalidate the already-existing contract. *See* 1 Corbin on Contracts § 3.31 (Matthew Bender & Co. 2013) ("exact and unconditional acceptance of an

offer" not vitiated by "one party's attempt to alter the terms of the contract in some respect").

Yet even when we credit Queen's claim of a verbal agreement to a 50/25/25 split, Queen still cannot carry his burden to demonstrate that the parties agreed to all material terms of the contract. Queen states in his affidavit that the 50/25/25 split of "income realized by the program after expenses" was "in addition to salaries." Queen Decl. ¶ 8. Presumably, that means "salaries" would count as "expenses" and would be subtracted from the amount to be apportioned according to the 50/25/25 formula. Queen, however, never suggests that the parties agreed upon salary numbers, and he never explains how salaries were to be calculated. That is no minor matter. If, for instance, we were to look to the market value of Schultz's services as a proxy for the missing salary term, *cf. Zeige Distrib. Co. v. All Kitchens, Inc.*, 63 F.3d 609, 613 (7th Cir. 1995) ("missing price term" may be "deducible from the market rate"), the salary payable to Schultz under the contract would equal the compensation he receives from MSNBC under his employment contract. Subtraction of that salary expense would in turn leave nothing for Queen, Schindler, and Schultz to divide according to the 50/25/25 formula.

Perhaps Queen would say that Schultz's "salary" under the verbal agreement should be pegged to some metric other than Schultz's MSNBC compensation. But Queen makes no such suggestion in his submissions. Rather, Queen states only that he, Schindler, and Schultz agreed to a 50/25/25 split of the show's income after subtracting salaries and other expenses, without any effort to identify the amount of salaries and other expenses. Queen, in short, has told us that the parties agreed to a 50/25/25 split, but has not told us *what* they agreed to split. As a result, even viewing the evidence

in the light most favorable to him, Queen fails to demonstrate that the compensation terms of the alleged contract are "clear enough for the court . . . to identify an appropriate remedy." *EastBanc*, 940 A.2d at 1002 (internal quotation marks omitted). We thus affirm the district court's conclusion that Queen has failed to create a genuine issue of material fact concerning the existence of a valid and enforceable contract between himself and Schultz (at least apart from Queen's partnership theory, which we take up next).

**B.**

Queen argues that he, Schindler, and Schultz formed a partnership under District of Columbia law, and that the partnership continued to exist even after Schindler's departure. *Cf.* D.C. Code § 29-606.03(a) (one partner's dissociation does not necessarily result in dissolution of partnership); *Creel v. Lilly*, 729 A.2d 385, 392-93 & nn.4-5 (Md. 1999) (noting that Revised Uniform Partnership Act, unlike the earlier version of the Act, "allows for the partnership to continue even with the departure of a member," and noting that District of Columbia is among jurisdictions to have adopted the new rule). Queen further argues that Schultz owed a duty of loyalty to the partnership and to his fellow partner under District of Columbia law, and that Schultz breached that duty by competing with the partnership in the conduct of partnership business. Schultz responds that he and Queen never formed a partnership. The district court agreed, concluding that Queen had failed to show a genuine issue of material fact with respect to the formation of a partnership. *Queen*, 888 F. Supp. 2d at 167.

We pause at the outset to note that Queen's complaint contains no assertion of a breach of partnership duties, and in fact nowhere uses the word "partnership." Queen

nonetheless argued at the summary judgment stage that he, Schindler, and Schultz had "entered into an oral agreement to establish a partnership," that they "agreed that the partners would share the profits from such a venture based upon a 50-25-25 split," and that he and Schultz "agreed to continue the partnership" after Schindler's departure. Pl.'s Opp. to Def.'s Mot. for Summ. J. 2, ECF No. 24; Mem. in Supp. of Pl's 2nd Opp. to Def.'s 2nd Mot. for Summ. J. 2, ECF No. 32. Citing Queen's scattered references to a "partnership," the district court decided that it not only would consider Queen's breach-of-contract claim independent of any partnership overlay, but would "also analyze the plaintiff's breach-of-contract claims under a partnership theory." *Queen*, 888 F. Supp. 2d at 164. Schultz now concedes in this court that the district court correctly chose to assess Queen's contract claim under a partnership theory. Because Schultz has disclaimed any waiver argument, we have no occasion to consider whether a plaintiff who makes no mention of any partnership in the complaint might thereby waive an argument premised upon a breach of partnership duties.

A partnership arises under District of Columbia law when "two or more persons . . . intend to associate together to carry on as co-owners for profit." *Beckman v. Farmer*, 579 A.2d 618, 627 (D.C. 1990); *accord* D.C. Code § 29-601.02(9). The "customary attributes" of a partnership include "profit and loss sharing," "joint control of decisionmaking," and "capital contributions." *Beckman*, 579 A.2d at 627 (internal quotation marks omitted). But those "customary attributes" only form "guidepoints of inquiry." *Id.* "[W]hether a partnership exists is an issue of fact, turning less on the presence or absence of legal essentials than on the intent of the parties gathered from their agreement, conduct, and the circumstances surrounding their transactions." *Id.* at 628 (citation omitted). When a trial court "must resort to

inferences from extrinsic evidence of the parties' conduct and course of dealings to determine their legal relationship," a "court's conclusion that the issue of partnership *vel non* could be resolved as a matter of law bears a heavy burden of justification." *Id.* at 630.

The District of Columbia Code establishes a "statutory presumption of partnership from evidence that a party shared in the profits of the business." *Id.* at 627 (citing earlier version of D.C. Code § 29-602.02(c)(3)). The statutory presumption of partnership does not apply, however, if the profits were received in payment for "services as an independent contractor or of wages or other compensation to an employee." D.C. Code § 29-602.02(c)(3)(B). Schultz claims that Queen was his employee, not his partner, and the district court appears to have credited that claim. *See Queen*, 888 F. Supp. 2d at 165-66. But Queen maintains that he was more than an employee or agent of Schultz: Queen says, in a declaration, that he, Schindler, and Schultz orally agreed to co-develop and co-own a television show. And the e-mail correspondence in the record shows that, while Schultz's attorney at one point proposed that Queen and Schindler enter into an "exclusive representation or agency agreement" with Schultz to negotiate a television deal on Schultz's behalf, Queen declined to sign. Although a jury could nonetheless find that Queen was Schultz's employee or agent rather than his partner, the court itself cannot make such a determination on this record at the summary judgment stage.

Schultz also contends (and Queen does not dispute) that he now works for MSNBC as an "independent contractor" under an "employment contract" with the network. Schultz Decl. ¶ 8-9, ECF No. 31-2. The district court therefore concluded that Queen's "claim to a percentage of [Schultz's] salary under a partnership theory fails as a matter of law."

*Queen*, 888 F. Supp. 2d at 166. But Schultz's status as an "independent contractor" or "employee" vis-à-vis MSNBC has little bearing on the viability of Queen's partnership theory. Queen's theory is that a partnership existed between him and Schultz, not between Schultz and MSNBC, and that MSNBC's offer of employment to Schultz was an opportunity that belonged to the Queen-Schultz partnership. Under District of Columbia law, a partner's duty of loyalty to the partnership includes a duty "[t]o account to the partnership and hold as trustee for it any property, profit, or benefit derived by the partner . . . [from] the appropriation of a partnership opportunity." D.C. Code § 29-604.07(b)(1). If one partner receives a salary or fee from a third party in the course of the partnership business, he may be obligated to account to his other partners for the salary or fee even though he was an "independent contractor" with respect to the third party. *See, e.g.*, *Beckman*, 579 A.2d at 639 (attorney who was member of now-dissolved law partnership entitled to share of other partners' fees for "work performed on partnership business unfinished at the date of dissolution"); *cf. Quigley v. Rosenthal*, 327 F.3d 1044, 1064 n.10 (10th Cir. 2003) (noting that attorneys generally are "independent contractors" with respect to their clients); *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 853 (3d Cir. 1996) (same). Thus, if Queen can show that he and Schultz became partners in the development of a television show, Queen can potentially prevail on the claim that he is entitled to a percentage of Schultz's compensation from MSNBC for "The Ed Show," regardless of whether Schultz was an independent contractor/employee with respect to MSNBC.

As an alternative ground for granting summary judgment to Schultz on Queen's partnership claim, the district court determined that Queen had "failed to create a genuine issue of fact regarding whether the parties intended to form a

partnership." *Queen*, 888 F. Supp. 2d at 166. We believe, however, that a reasonable jury could conclude from the parties' conduct and communications that Queen and Schultz intended to, and did, form a partnership to develop a television show. Of course, it remains to be seen whether a jury in fact will find the existence of a partnership. The question for our purposes is whether Queen made a sufficient showing to present the matter to a jury, and we conclude that he did.

First, Queen says he developed the concept for the show, marketed the show to NBC and MSNBC executives, arranged for the production of the pilot, and negotiated with CBS's Washington affiliate for a Sunday morning timeslot. A reasonable jury that credited Queen's testimony on those points could conclude that Queen shared in control of decisionmaking. *See Beckman*, 579 A.2d at 627 ("joint control of decisionmaking" is "customary" attribute of partnership); *accord Brown v. 1401 N.Y. Ave., Inc.*, 25 A.3d 912, 914 (D.C. 2011). Although Queen's e-mail to Landa on May 29, 2008 stated that Schultz would have "total control" of content, hiring, and production decisions, a reasonable jury could accept Queen's argument that he nonetheless retained control over other aspects of the partnership business (e.g., finances, logistics, and marketing).

Second, Queen contends that he advanced $11,000 to rent an NBC studio for the pilot, paid other pilot expenses, and devoted considerable time and energy to the partnership. All of those outlays potentially qualify as capital contributions to the partnership. *See* Black's Law Dictionary 237 (9th ed. 2009) ("capital contribution" defined as "[c]ash, property, or services contributed by partners to a partnership"). "[C]apital contributions" are among the "attributes of co-ownership" to which District of Columbia

law looks in determining whether parties have formed a partnership. *Beckman*, 579 A.2d at 627.

Third, Queen's claim that he, Schindler, and Schultz agreed to form a partnership to develop a television show draws support from Schindler's sworn statement that he "agreed to partner in the project" with Queen and Schultz. Schindler Decl. ¶ 2. While Schultz dismisses Queen's version of events as "self-serving," that line of attack does not apply to Schindler, a non-party who seeks nothing from Schultz in this litigation.

Fourth, although there is no evidence that Queen and Schultz actually shared profits from the show, Schultz's April 5, 2008 e-mail to Queen assured Queen that he would have "a financial involvement" in any "TV deal." A reasonable jury could interpret that assurance as an indication that Schultz and Queen intended to associate as co-owners for profit. Of course, a jury might also draw a different inference, but "summary judgment is not available" when material facts are "susceptible to divergent inferences." *Carney v. Am. Univ.*, 151 F.3d 1090, 1093 (D.C. Cir. 1998) (internal quotation marks omitted).

Finally, Queen's failure to demonstrate an enforceable agreement with regard to compensation—while fatal to his ordinary breach-of-contract claim—does not defeat his argument that he and Schultz formed a partnership under District of Columbia law. In the context of a partnership agreement, the default provisions in the District of Columbia Code can supply certain essential terms to which the parties never explicitly agreed. *See* D.C. Code § 29-601.04(a) ("To the extent the partnership agreement does not otherwise provide, this chapter shall govern relations among the partners and between the partners and the partnership.").

And the default rule under District of Columbia law holds that, absent an explicit agreement otherwise, "[e]ach partner shall be entitled to an equal share of the partnership profits." D.C. Code § 29-604.01(b); *see also Robinson v. Nussbaum*, 11 F. Supp. 2d 10, 15 (D.D.C. 1997).

It might seem counterintuitive that Queen, having failed to demonstrate the existence of an enforceable agreement entitling him to 25% of the income after expenses from "The Ed Show," can nonetheless pursue a partnership theory that could entitle him to a 50/50 split of profits with Schultz. But the "equal share" allocation under District of Columbia partnership law applies only as a default matter in the absence of an explicit agreement between the parties. Accordingly, as the District of Columbia Court of Appeals has explained in a comparable context, insofar as the default provisions of District of Columbia partnership law might lead to "harsh results," the parties could always enter into a partnership agreement that would supersede the default rules. *See Beckman*, 579 A.2d at 640.

In any event, any consideration of the amount of damages payable to Queen would be premature in advance of a jury verdict on whether the parties formed a partnership in the first place. And even if Queen were to persuade a jury that he and Schultz formed a partnership, Queen still would need to prove that Schultz breached his duty of loyalty under District of Columbia partnership law. A partner's duty of loyalty includes a duty to "refrain from competing with the partnership in the conduct of the partnership business before the dissolution of the partnership." D.C. Code § 29-604.07(b)(3). Queen submits that Schultz breached the duty of loyalty when he accepted an offer to host a weekday show on MSNBC, while Schultz says he worked with Queen solely to produce a *Sunday morning* television show. Each party

cites portions of the record that support his position, but neither party puts forward incontrovertible evidence that proves him right. Resolution of that issue therefore will require "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts," all of which are "jury functions" and "not those of a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (internal quotation marks omitted).

\* \* \* \* \*

We conclude that the district court correctly granted summary judgment to Schultz on Queen's claim that he, Schindler, and Schultz entered into an enforceable contract to divide the profits from a potential television show 50/25/25. But insofar as Queen claims that he and Schultz formed a partnership to develop a television show and that Schultz breached his duty of loyalty under District of Columbia partnership law, Queen is entitled to present his claim to a jury. We therefore affirm the judgment of the district court in part, reverse it in part, and remand for further proceedings consistent with this opinion.